James Lee BEATHARD, Appellant,

v.

The STATE of Texas, Appellee.

No. 69474.

Court of Criminal Appeals of Texas,
En Banc.

March 8, 1989.
Rehearing Denied May 10, 1989.

Jimmy James, Houston, for appellant.

Joe L. Price, Dist. Atty., Groveton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(2). After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death.

The appellant was convicted of intentionally causing the death of Marcus Hathorn in the course of committing and attempting to commit the offense of burglary. Appellant raises five points of error. He argues that the evidence was insufficient to prove that the murders occurred during the course of a burglary; that there was insufficient corroboration to support the accomplice testimony of Gene Hathorn; that the indictment was insufficient because it failed to allege the elements of burglary within the capital murder charge; that the judge's failure to instruct the jury at the punishment phase concerning appellant's right not to testify requires a new trial; and that the judge erred in denying appellant's motion for new trial because of newly discovered evidence after Hathorn recanted his prior testimony. We will affirm the conviction.

Appellant and Gene Hathorn, Jr., appellant's accomplice, became acquainted while working at the State Hospital at Rusk. Both living in Rusk, the two men continued their friendship after appellant left his job at the hospital. Recurrent topics of conversation were Hathorn's desire to commit "the perfect murder" and his wish to kill his father, stepmother, and half-brother, a wish motivated by animosity and the pros-

pect of an inheritance. Hathorn, whose parent's lived in a trailer located in an isolated and wooded area, planned to shoot everyone in the trailer using a number of different weapons, take several items that would be missed, and plant Negroid hairs and the butts of cigarettes that had been smoked by blacks. He hoped to make the killings look like a burglary committed by a group of "drug-crazed niggers." In addition to his plan for the scene of the crime, Hathorn wanted to have an accomplice. The accomplice was to provide an alibi as well as to help with the shootings. Hathorn proposed his plan to a few different people, but appellant was the only interested party. Appellant requested $12,500 from the proceeds of the estate for his participation in the murders.

On October 9, 1984, appellant and Hathorn left Rusk and went to Nacogdoches, ostensibly for appellant to check some books out of the library at Stephen F. Austin University, where appellant had formerly been a student. The two went to Nacogdoches by way of Gallatin, in Cherokee County. Appellant had relatives who owned property near Gallatin. There, appellant and Hathorn conducted some target practice with Hathorn's shotgun. When finished, they went on to Nacogdoches. While in Nacogdoches, the two went to several highly visible places in addition to the library. When finished, they drove on to Hathorn's parents' home in Trinity County, near Nogalus Prairie.

Hathorn testified that when he and appellant arrived at his parent's home, they got out of the car. Hathorn gave appellant a .380 pistol, a Ruger Mini–14 rifle, and cellophane packets containing the hair and cigarettes butts that they were going to leave at the scene. Hathorn kept the shotgun. Thus armed, the men cut through the woods until they got to the driveway leading to the Hathorn's trailer. They followed the driveway until they reached the clearing around the trailer. At this point, they followed the tree line around the clearing to the trailer. Hathorn went behind the trailer, and appellant went to the back door. Once positioned, Hathorn fired a shot through a large back window. When

the shot was fired, Mr. Hathorn was sitting with his back to the window with his head visible above the top of the sill. Upon hearing the shot, appellant was to enter the back door with the remaining two weapons in order finish any job that the shotgun blast failed to do, plant the evidence, and remove agreed upon items of property. Hathorn said that he heard shots fired from inside the trailer. A few minutes later, appellant came out the front door of the trailer carrying a video cassette recorder, a video disk player, and a number of the Hathorn family's guns. They both loaded the items into the car. Hathorn drove a van belonging to the victims, and appellant drove the car in which they had arrived. Hathorn drove to Nigton, a "predominantly black" area. There, he left the van on a residential street and joined appellant in the car they had brought. Next, they drove to Nacogdoches, stopping twice to drop the items removed from the trailer, the pistol, and the rifle off of two different bridges into two different rivers. Arriving in Nacogdoches, they returned to the library to check out an additional book. Completing this, they returned home.

Crime scene investigators and a forensic pathologist testified about the physical evidence discovered. The evidence and testimony of these witnesses corroborated, as far as possible, Hathorn's version of the facts. The forensic pathologist testified that all three victims had wounds from a shotgun blast or blasts. In addition, Mr. and Mrs. Hathorn had fragments of glass and other debris in their wounds which would be consistent with a shotgun being fired through a window. He went on to say that, based on his examinations, the shotgun wounds of the victims were the first gunshot wounds to be inflicted. Assuming that the shotgun wounds occurred simultaneously, the additional gunshots to Mr. and Mrs. Hathorn, whose bodies were found in the living room, were inflicted next, and the additional wounds to Marcus, the Hathorn's son, whose body was discovered in a bathroom, were inflicted last. Investigators at the crime scene stated that the pattern of buckshot which hit the ceil-

ing and opposite wall of the trailer would be consistent with that which would have been made if Hathorn's shotgun had been fired from the position from which Hathorn testified that he had fired. The locations of shell casings found inside the trailer and the projected trajectory of the shots fired would be consistent with an individual entering through and firing from the trailer's back door. Ballistics tests matched the bullets recovered from the bodies to Hathorn's pistol[1] and rifle.

Appellant testified and denied his complicity in the murders. He admitted that he accompanied Hathorn to Gallatin and to Nacogdoches; however, he said that he agreed to leave Nacogdoches with Hathorn because he was offered an opportunity to make $2,000 by participating in a drug transaction. Appellant's account of the trip to the Hathorn residence coincided with that of Hathorn until the two arrived at their destination. Appellant said that the two drove all of the way up the driveway and to the trailer. He said that Hathorn instructed him to stay outside while he went into the trailer to conduct his transaction. Hathorn went to the door, knocked, and entered the trailer for a short while. After leaving the trailer, Hathorn went to the car and retrieved the shotgun. Hathorn, who was now wearing rubber gloves, then went to appellant, who was standing away from the mobile home near a camper trailer parked in the yard, and told him, "I don't want to have to do it this way." Hathorn then rapidly turned and fired the shotgun through the back window "as if he were shooting skeet" and shouted

"Mommy and Daddy get down somebody's shooting at us."[2] He then said to appellant "If I go down you go down. Shoot anything that moves." And, then handed appellant the shotgun. Hathorn then ran off, but appellant did not see where Hathorn ran because he laid down on the ground. At this point, appellant said that he did not see Hathorn in possession of any other weapons and, at that point, had not seen any weapon, other than the shotgun, during the evening. "A few seconds later," appellant heard three or four shots fired rapidly, a pause, and a similar group of shots. Unsure of what was happening, appellant said that he crept into the edge of the woods and hid. After a while, appellant worked his way back to the camper and shouted for Hathorn. Hathorn shouted back for appellant to get back in the car. From the point appellant returned to the car, the two men's stories again coincide.[3]

■ In his second point of error, appellant argues that the evidence was insufficient to prove that he killed Marcus Lee Hathorn while in the course of committing burglary upon the habitation of Gene Hathorn [Sr.]. This point of error focuses on the burglary component of V.T.C.A. Penal Code, § 19.03(a)(2), rather than whether appellant committed a murder under V.T.C.A. Penal Code, § 19.02(a)(1). Appellant argues that entry into the Hathorn's residence was with the intent to kill the occupant's rather than to commit a theft or robbery, and that the taking of property was merely a ruse intended to mislead law enforcement officials.[4] In other words, if

1. Although the pistol was never recovered from the river, the bullets from the crime scene matched other bullets known to have been fired from that gun.

2. Testimony concerning the pattern of shot from the initial blast suggests that the shotgun was not fired from the location from which appellant testified that Hathorn fired.

3. Appellant could not actually corroborate all of the details which followed this point in time. He testified that he was suffering from memory lapses. Appellant and his attorneys implicitly suggested some form of traumatic amnesia concerning what happened after leaving the Hathorn residence. The details that appellant was

able to provide are consistent with Hathorn's testimony.

4. Appellant relies on the voucher rule announced in Palafox v. State, 608 S.W.2d 177 (Tex.Cr.App.1979), to bind the State to Hathorn's statements concerning the parties' intent upon entering the residence as well as their planning prior to commission of the crime. We need not rely on the Palafox voucher rule in deciding the instant case because all evidence in the record, Hathorn's testimony, police testimony, physical evidence at the scene, and abandonment of the property at first opportunity, points to the inescapable conclusion that the property was taken in order to misdirect police investiga-

appellant is guilty, it is of committing a burglary during the course of murder, rather than a "murder in the course of committing or attempting to commit ... burglary...." V.T.C.A. Penal Code, § 19.03(a)(2). The State responds that burglary may be committed by an entry to commit a felony or theft. V.T.C.A. Penal Code, § 30.02(a)(3), and that the evidence was sufficient to prove both types of burglary. In addition, although the primary motive was to kill the occupants, it is permissible to rely on a secondary motive for entering the habitation. Hathorn's testimony indicated that the actors had an intent to kill, a felony, and to take property without effective consent, theft, prior to entry.

In judging the sufficiency of the evidence to sustain a conviction, this Court will compare the evidence adduced to the judge's charge to the jury in order to determine whether a rational trier of fact could find all requirements set out in the charge beyond a reasonable doubt. *Marras v. State*, 741 S.W.2d 395, 408 (Tex.Cr.App. 1987) (and cases cited therein). The instructions to the jury required the jury to find, beyond a reasonable doubt, that appellant intentionally killed Marcus Lee Hathorn "while in the course of committing or attempting to commit burglary of a habitation owned by Gene Hathorn." Further, the charge stated that "A person commits burglary of a habitation if, without the effective consent of the owner, he *enters a habitation with intent to commit a felony* or any theft." [emphasis added]. For purposes of this point of error,[5] the evidence is sufficient if the jury could find, beyond a reasonable doubt, that appellant entered the Hathorn residence with intent to commit a felony.

Recently, this Court has held that an unlawful entry into a habitation with the intent to commit murder will satisfy the burglary element of a capital murder charge. *Fearance v. State*, (Tex.Cr.App. No. 69,024 delivered Dec. 7, 1988) (not yet reported, slip op. at pp. 10–11). Therefore, if the jury could reasonably have found from the evidence that appellant entered the Hathorn residence with the intent to commit murder, then the evidence is legally sufficient.[6] Hathorn expressly stated that appellant agreed to a plan by which he would enter the trailer after Hathorn fired the shotgun and kill the occupants. Hathorn also testified that appellant had gone to the back of the trailer, that there were gunshots fired from within the trailer, and that, after the shots were fired, appellant exited the front of the trailer. In addition, testimony showed that the guns that Hathorn said that he gave to appellant were the same ones that caused the deaths of all three occupants. Based on this evidence, a rational trier of fact could have easily found, beyond a reasonable doubt, that appellant entered the trailer and that entry was with the intent to commit murder. Appellant's second point of error is overruled.

◼ In his third point of error, appellant argues that there was insufficient evidence to corroborate the testimony of accomplice, Gene Hathorn. Art. 38.14 V.A.C.C.P. Appellant argues that, aside from Hathorn's testimony, the evidence proves only that appellant was present at the scene of the crime, a fact which is not inconsistent with appellant's defense. Relying on *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr.App.1971), he argues that mere presence of a defendant at the scene of a crime is not sufficient to corroborate accomplice testimony. The State counters by summarizing the independent pieces of evidence which corroborate certain details of Hathorn's testi-

---

tion. Thus, on the facts of this case, *Palafox* does not apply.

We also wish to note that we are not deciding whether the *Palafox* rule may be extended to statements made by someone other than the defendant.

5. In this point of error, appellant has limited his challenge to the sufficiency of the evidence to the burglary element of his capital murder conviction.

6. Because both the indictment and the jury charge allow for a conviction based on entry with intent to commit a felony, we need not address appellant's specific contentions concerning entry with intent to commit a theft.

mony and those which tend to connect appellant to the commission of the murders.

Appellant correctly argues that "[n]o one may be convicted on the basis of accomplice testimony without other evidence which corroborates the accomplice testimony and tends to connect the defendant with the commission of the charged offense." *Cockrum v. State,* 758 S.W.2d 577, 581 (Tex.Cr.App.1988); Art. 38.14 V.A.C.C.P. "The test for weighing the sufficiency of corroborative evidence is to eliminate from consideration the testimony of the accomplice witness and then examine the testimony of other witnesses to ascertain if there is evidence which tends to connect the accused with the commission of the offense." *Id.* at p., 581 (See also cases cited therein). We will address each of the corroborative pieces of evidence set out in the State's brief, as well as other evidence in the record, to determine the sufficiency of the corroborating evidence.

■ The State argues that the fact that the Hathorn van had been moved 18 miles to Nigton serves to corroborate the accomplice testimony. This argument reasons that a single person could not, within the time frame established by other evidence, have driven the van to its destination and walked back to the Hathorn's trailer in order to pick up the other car. In addition, a witness testified that, at about 9:15 P.M. on the night of the murder, he saw the Hathorn's van being followed closely by another vehicle, and appellant admitted that he aided in moving the van to Nigton. The State is correct that this evidence sufficiently proves that two people were at the murder scene and participated in moving the van. This evidence, however, does not "tend to connect" appellant to the crime. Mere presence of a defendant at the scene of a crime is insufficient to corroborate accomplice testimony. E.g., *Brown v. State,* 672 S.W.2d 487, 489 (Tex. Cr.App.1984). In addition, this element of "corroboration" merely proves details of the accomplice's testimony. It does not

corroborate a fact which tends to connect appellant to the killing. *Losada v. State,* 721 S.W.2d 305, 308 (Tex.Cr.App.1986); *Paulus v. State,* 633 S.W.2d 827, 844 (Tex. Cr.App.1981). No matter how convincingly proven, the fact that some person helped Hathorn move the van does not disprove appellant's exculpatory version of the facts and fails to connect appellant to the commission of the killing.

■ The State argues that, because items taken from the Hathorn residence and one of the murder weapons were found where the accomplice witness said that they would be found, Hathorn's testimony was corroborated. Analytically, this is identical to the State's previous argument. Discovery of these items does corroborate the accomplice's testimony that the items were thrown from specific river crossings. This physical evidence, however, does not corroborate accomplice's assertions which connect appellant to the commission of the murders. *Losada,* supra; *Paulus,* supra. Therefore, this evidence does not tend to connect appellant to the commission of the offense within the framework of Art. 38.14. V.A.C.C.P. *Reed v. State,* 744 S.W.2d 112, 125 (Tex.Cr.App.1988).

■ The State contends that testimony from the accomplice's wife corroborated accomplice's testimony. She testified that, on the night of the murders, Hathorn told her that they were to go to his parents' home the next morning. Again, this testimony represents corroboration of a detail which fails to connect appellant to the commission of the offense. *Losada,* supra; *Paulus,* supra.

■ Hathorn, in a taped conversation with Neil Shriver, admitted that he murdered his family and that he was *assisted* by an unnamed person.[7] The State argues that this prior consistent statement serves to prove that Hathorn was aided in the commission of these murders. Coupled with proof that appellant was the only oth-

7. Although Hathorn did not name appellant during this conversation, he did provide a description of his accomplice. This description set out the unnamed person's family back-ground and current situation. This description fit appellant. Based on this description, a rational trier of fact could have found that Hathorn was describing appellant.

er person present at the scene of the crime the State reasons that it was appellant who assisted Hathorn. The underlying premise behind the accomplice witness rule is the idea that an accomplice witness is a "discredited witness" and that "the testimony of an accomplice witness is to be carefully scrutinized not only because of any interest he or she might have, but because her or his testimony is evidence from a corrupt source." *Paulus,* supra at 843. Given these concerns over the witness's potential bias and inherent lack of credibility, a prior consistent statement made by that same witness fails to provide the additional degree of reliability that corroboration by *independent* evidence would provide and that Art. 38.14 requires. *McCormick on Evidence,* (E. Cleary ed. 3d ed. 1984), makes the following observations about the relevance of prior consistent statements to prove the truth of a current statement.

> What kind of attack upon the witness opens the door to evidence of prior statements by the witness consistent with his present story on the stand? When the attack takes the form of impeachment of character, by showing misconduct, convictions or bad reputation, it is generally agreed that there is no color for sustaining by consistent statements. The defense does not meet the assault. Further, if the attacker has charged bias, interest, corrupt influence, contrivance to falsify, or want of capacity to observe or remember, the applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated.

*McCormick on Evidence,* supra at 118–19 Here, the underlying basis for the accomplice witness rule effectively challenges the witness's character and places bias at issue. Hathorn had every reason to tell Shriver the same story that he told at trial— Hathorn knew at that time that appellant was present at the scene and, if appellant's version were a true statement of the facts,

that appellant posed the greatest threat as a source of inculpatory evidence. Because, in this situation, the witness's prior consistent statement fails to address the questions of credibility which underlie Art. 38.14, e.g., bias, lack of credibility, motive, and corrupt source, Hathorn's statements to Shriver do not corroborate the accomplice testimony.

Neil Shriver and Larry Brown both testified that, before the murder, Hathorn attempted to recruit them to participate in a scheme to murder his parents. Each of these solicitations involved plans similar to that which was ultimately used and would have required Hathorn's assistant to actually participate in the killing. Such testimony is to be distinguished from Hathorn's prior consistent statement because it was not a potentially self-serving assertion of fact. Instead, this testimony serves to show that Hathorn wanted somebody to help him with the killings. The relevance of this testimony is to prove that Hathorn had formed a specific plan for killing his parents. Coupled with the assumptions that Hathorn stayed with his original plan and that the events of the murder comported with that plan, one can infer that anyone accompanying Hathorn on the night of the murders did so pursuant to that plan. Because the corroborative value of the testimony rests in part upon two assumptions, the validity of which we cannot be certain, the corroborative strength of this testimony is also uncertain.

■ Similar to Hathorn's attempts to solicit help in committing the murders is the testimony of Cathy Ross [8] concerning conversations that she overheard between appellant and Hathorn. Ross testified that, on more than one occasion, she heard appellant and Hathorn discussing a plan to commit the "perfect murder." Whether these conversations represented the planning of an actual murder or merely a hypothetical one, they serve to show that Hathorn had formed a plan and that appellant

---

**8.** Cathy Ross was appellant's girl friend. The two had lived together for approximately 18 months prior to the murders.

was aware of its details.[9] This fact serves to strengthen the reasoning set out concerning the testimony of Brown and Shriver.

Cathy Ross testified that on the weekend before the murders occurred, appellant went to the Stephen F. Austin library and checked out some books.[10] In addition, this was the first time that appellant had gone to the university's library since he had dropped out of school. Appellant's sudden decision to, twice in one week, check out books from this library is suspicious given appellant and Hathorn's apparent[11] attempt to use the time-stamped books as an alibi. "Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Brown*, supra at 489 (and cases cited therein). While not independently sufficient to corroborate Hathorn's testimony, Ross's testimony provides a "suspicious circumstance" which tends to corroborate the testimony by suggesting the existence and implementation of a plan.

Independent evidence which generally tends to prove that an accomplice witness's version of events is true, rather than the version given by the defendant, is considered corroborative, even if it concerns a mere "detail," as opposed to a substantive link between the defendant and commission of the offense. See *Brown*, supra at 489; *Paulus*, supra at 845. The remaining corroborative evidence, while coming from various sources, is all of this variety. First, ballistics evidence concerning the point from which the shotgun blast was fired supports Hathorn's testimony and is contrary to that of appellant.[12] Second, appellant testified that, when Hathorn fired the shotgun he did not have the rifle in his possession. Hathorn testified that he fired the shotgun and that appellant immediately entered the back door and began to fire. The pathologist testified that the bullet wounds to Mr. and Mrs. Hathorn were inflicted very quickly after they were struck by the shotgun pellets. Under appellant's version of the facts, Hathorn had to fire, give appellant the shotgun and instruct him to "shoot anything that moves," run toward the back of the trailer, retrieve the rifle from the car, return to the back of the trailer, enter the trailer, and begin to fire. Hathorn's version is more consistent with the pathologist's testimony concerning the time between shots.[13] Third, Hathorn

9. Appellant acknowledged that he suggested the possibility of planting certain physical evidence at the scene of the crime in order to create the impression that the crime was committed by blacks. Such evidence was, in fact, found at the scene. Appellant claimed that the discussion was merely an intellectual exercise concerning a hypothetical "perfect murder."

10. The State suggests that this first trip to the library served as a "dry run" for the night of the murder.

11. Hathorn testified that the trip with appellant to Nacogdoces was undertaken with the intent of establishing an alibi. The record also reveals that the time at which library books are checked out is recorded in the library's computer. A trier of fact would be justified in infering that the library visit was intended to establish that they were in Nacogdoches at a specific time.

12. The testimony of appellant placed the location from which the shotgun was fired by reference to the travel trailer. The distance between the specified location and the window was later measured. Therefore, appellant's testimony

was very precise as to the location from which Hathorn fired. Likewise, the ballistics estimate of the origin of the shot was very exact. The ballistics examiner had access to the shotgun that was fired at Mr. Hathorn and was, therefore, able to measure the spread and pattern of the weapon. Thus, given the evidence in this record, the three to five foot difference between appellant's account and the opinion of the ballistics expert is significant. Absent any of these factors which add to the precision of appellant's and the expert's testimony, a three to five foot difference might be explained by inexact estimates.

13. Although inconsistent with the pathologist's testimony, appellant's version is not irreconcilably so. The margin of error likely to be present in the pathologist's estimate might be sufficiently large to allow for a sufficient delay before the second wound was inflicted. In addition, there was testimony at the motion for new trial, that Hathorn had the pistol in his pocket when he fired the shotgun. Although not in evidence at trial, this testimony suggests a second scenario which would be consistent with appellant's version of the facts.

testified that appellant was wearing overalls, a t-shirt, and a certain pair of tennis shoes. Hathorn stated that appellant said that he intended to dispose of his shoes so that, in the event footprints were discovered at the scene, they could not be matched to his shoes. Appellant denies this statement and that he ever owned a pair of shoes like those Hathorn described. Cathy Ross confirmed Hathorn's description of appellant's dress and said that, since the day of the murder she had never again seen these articles of clothing.

Given appellant's admitted presence at the scene of the crime and the number of factors which we have found that tend to connect appellant to the crime, we hold that the evidence is sufficient to corroborate the testimony of Hathorn. Appellant's third point of error is overruled.

■ In his first point of error, appellant argues that the indictment was insufficient because it failed to allege the elements of the burglary which was used to bring this murder under V.T.C.A. Penal Code, § 19.03. Appellant begins this point of error by acknowledging that this Court has repeatedly held that an indictment need not allege the constituent elements of the aggravating feature which elevates a murder to capital murder. E.g., *Marquez v. State*, 725 S.W.2d 217, 236 (Tex.Cr.App.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 201, 98 L.Ed.2d 152 (1988) (aggravated sexual assault); *Hammett v. State*, 578 S.W.2d 699, 708 (Tex.Cr.App.1979) (robbery); *Hogue v. State*, 711 S.W.2d 9, 14 (Tex.Cr.App. 1986), *cert. denied*, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (arson). Appellant does not provide any authority or analysis which would compel us to except capital murders predicated on burglary from this general rule. See *Hogue*, supra at 14. Appellant's first point of error is overruled.

In appellant's fifth point of error, he claims that the trial judge erred in refusing to give the jury a "no-adverse-inference" instruction concerning his failure to testify at the punishment phase of trial. The State responds that appellant waived his Fifth Amendment privilege by testifying at the guilt/innocence stage of the trial and was therefore not entitled to an instruction. Alternately, the State contends that if the failure to instruct the jury was error, the error was harmless.

■ First, we will decide whether appellant waived his Fifth Amendment rights by testifying during the first portion of his trial. In *Brumfield v. State*, 445 S.W.2d 732 (Tex.Cr.App.1969), the defendant testified at the guilt/innocence phase of his trial and was convicted. The indictment alleged a number of prior convictions for enhancement purposes. During the punishment phase, the State called the defendant as a witness in order to prove those convictions. The defendant objected on the basis of the Fifth Amendment. The trial judge overruled the defendant's objection, compelling defendant to testify. In a case of first impression,[14] this Court held that, for purposes of Fifth Amendment waiver, the punishment and guilt/innocence portions of a criminal trial are to be treated as separate hearings. *Id.* at 741. Thus, defendant's waiver during guilt/innocence did not carry over to punishment. We reversed that conviction.

The State counters that in *Penry v. State*, 691 S.W.2d 636 (Tex.Cr.App.1985), *cert. denied*, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986), later proceeding *Penry v. Lynaugh, cert. granted* (on separate grounds) —— U.S. ——, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988), this Court held that a defendant waives his Fifth Amendment right to be warned prior to psychiatric examination[15] when he introduces evidence of insanity at the guilt phase of his trial. Although correctly stating our holding in *Penry*, this argument fails because of factual distinctions between these cases. When a defendant introduces evidence of insanity, the State may compel him to submit to psychiatric examination. *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906,

---

**14.** This was an early case tried under the 1965 Code of Criminal Procedure, which first created our present bifurcated trial procedure.

**15.** *See Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

2917–18, 97 L.Ed.2d 336 (1987). In such a situation, a warning stating that the defendant has a right to refuse examination would be an incorrect statement of law. Therefore, the absence of warnings does not taint the examination. *Id.* On the other hand, the State may not call a defendant to testify at punishment simply because he testified at guilt/innocence. *Brumfield,* supra at 741. Thus, our holding in *Penry* is applicable only within the limited area of psychiatric examinations and *Estelle v. Smith* error. We hold that appellant did not waive his Fifth Amendment rights during the punishment phase of his trial.

■ Upon request from a defendant, a trial judge must instruct jurors that they may not draw any adverse inference from a defendant's failure to testify. *Carter v. Kentucky,* 450 U.S. 288, 305, 101 S.Ct. 1112, 1121–22, 67 L.Ed.2d 241 (1981). The right not to testify continues beyond conviction until after a defendant has been sentenced. *Brown v. State,* 617 S.W.2d 234, 237 (Tex.Cr.App.1981); *Brumfield,* supra at 735. Therefore, because appellant's right against self-incrimination extended to the punishment phase of trial and that right had not been waived, appellant was entitled to a "no-adverse-inference" instruction upon timely request.

■ Finding error, we now must determine whether the error was harmless.[16] Normally, because this is an instance of charging error with timely objection, we would apply the "some harm" test set out

in *Almanza v. State,* 686 S.W.2d 157 (Tex. Cr.App.1985); c.f. *Rose v. State,* 752 S.W. 2d 529 (Tex.Cr.App.1988). However, the Supreme Court has stated, "The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law." *Chapman v. California,* 386 U.S. 18, 21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967). When an error implicates rights flowing from the United States Constitution, we must apply the harmless-error rule enunciated by the Supreme Court. *Id.* Before a "federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828. This is the same standard imposed by our general harmless-error rule. Tex.R. App.Pro. 81(b)(2).

The right to a "no-adverse-inference" instruction is rooted in a jury's natural tendency to assume that the decision not to testify stems from a defendant having something to hide. See generally *Carter v. Kentucky,* supra. In the instant case, this was not a concern. By testifying during guilt/innocence, the jury heard numerous things from the appellant.[17] In addition, the State presented no evidence at the punishment phase. Thus, appellant was not placed in a position where the jury would expect him to counter factual assertions made by the State. In fact, if the jury was to draw any improper inference from a failure to present a case, it would have been made against the State.[18] Appellant

16. In *Carter v. Kentucky,* supra, the Supreme Court expressly reserved the question of whether this type of error can be harmless. *Carter,* supra at 304, 101 S.Ct. at 1121. To the extent that we believe that the error in this case could not have contributed to the jury's answers to the special issues, we must necessarily find that this is not a right which is "so basic to a fair trial that [its] infraction can never be treated as harmless...." *Chapman,* supra 386 U.S. at 23, 87 S.Ct. at 827–28.

17. During guilt/innocence, appellant related his version of the facts, his current and past employment, his educational attainments, his family background, and his lack of any criminal record. Aside from a plea for mercy, which was made by appellant's mother, we can think of nothing else that appellant could have said

during the punishment phase that he had not already said.

18. During voir dire, each venireman who was ultimately selected to sit as a juror was instructed both on appellant's personal right not to testify and his general right not to put on a defense. Each venireman/juror stated that he or she understood these rights and would not hold it against the defendant if he did not testify or call witnesses.

These instructions are of particular importance because, at punishment, appellant went beyond what was required of him by calling witnesses. The jury knew he was not obligated to do so.

did, however, call six witnesses.[19] Limited to the unusual factual setting of this case, we find that the trial judge's error in failing to give a "no-adverse-inference" instruction was, beyond a reasonable doubt, harmless. Appellant's first point of error is overruled.

■ In his fourth point of error appellant argues that the trial judge erred in not granting an out-of-time motion for new trial based on Hathorn's recantation of his prior testimony and his new testimony which sought to exculpate appellant. On March 5, 1985, the trial judge entered a judgment of conviction. Appellant filed a "Motion For Leave To File Out Of Time Motion For New Trial" on December 3, 1986. On December 17, there was a hearing on the motion, and the judge denied the motion. Without reaching the merits of appellant's motion for new trial, we hold that the motion was not timely and that the trial judge did not have jurisdiction to consider it.

Under the law applicable at the time when judgment was filed, appellant had thirty days to file his motion for new trial based on newly discovered evidence.[20] Art. 40.03(6) V.A.C.C.P.; Tex.R.Civ.P. 329b(a) (imposing the same requirements for motions for new trial which do not rely on newly discovered evidence as former Art. 40.05 V.A.C.C.P.). Under former Art. 40.-05, a trial judge had no jurisdiction to entertain an out of time motion for new trial. *Drew v. State*, 743 S.W.2d 207, 223 (Tex.Cr. App.1987) (disallowing out of time motions for new trial based on jury misconduct, Art. 40.05, and newly available evidence, Art. 40.03(6), supra, and Rule 329b, supra)

and cases cited therein. Thus, under the time table set into motion upon appellant's conviction, sentencing, and entry of judgment, the trial judge had no jurisdiction to decide appellant's motion on the merits. Appellant's fourth point of error is overruled.

Having considered the appellant's points of error and finding no reversible error, we affirm the judgment of the trial court.

CLINTON, J., concurs in result.

MILLER, J. dissents.

TEAGUE, Judge, dissenting.

I respectfully file this dissenting opinion.

James Lee Beathard, henceforth appellant, was convicted of capital murder. After the jury answered the special issues that were submitted to it pursuant to Art. 37.071, V.A.C.C.P., the trial judge assessed appellant's punishment at death.

Appellant testified at the guilt stage of the trial but did not testify at the punishment stage of the trial.

During the punishment phase of appellant's trial, appellant timely objected to the trial judge's failure to instruct the jury on appellant's failure to testify at that stage of the trial. Appellant complains on appeal of the trial judge's action in his fifth point of error. The majority opinion agrees with appellant that the trial judge erred, but further holds that, because *it* cannot find that the error made any contribution to the jury's answers to the submitted special issues, the error is harmless. Because I disagree with the latter holding, I respectfully dissent.

**19.** During the punishment phase appellant called six character witnesses. These included his mother and Cathy Ross, the woman with whom appellant was living. These witnesses testified to appellant's good and nonviolent character. Appellant's mother also testified about appellant's childhood. In addition to these six witnesses, appellant called twenty different character witnesses during the guilt/innocence phase. A number of these witnesses were psychologists or psychiatrists with whom appellant had worked at the Rusk State Hospital. The witnesses with psychological training generally testified concerning appellant's nonviolent tendencies. This testimony was similar

to that which is often used to rebut psychological evidence of future dangerousness.

**20.** Article 40 of the Code of Criminal Procedure was repealed, effective September 1, 1986. This occurred just over two months before this motion for new trial was filed. The current rule concerning the timely filing of motions for new trial is now found in Tex.R.App.Pro. 31. Because the requirements of Rule 31 are, within the context of this case, the same as former Art. 40.05 and Tex.R.Civ.Pro. 329b, the analysis set out in *Drew* is applicable without expansion or modification.

In *Brown v. State*, 617 S.W.2d 234, at 238 (Tex.Cr.App.1981), which was a non-capital murder case, this Court unequivocally and without any reservations stated the following:

We hold that where a request is made to the trial court to add to its charge at the punishment stage of the trial an instruction on the failure of the defendant to testify, or an objection is made to the omission of such charge, *it is reversible error if the trial court fails to honor that request or objection* because we find that 'members of the jury, unless instructed otherwise, may well draw adverse inferences from a defendant's silence,' at the punishment phase of the trial, just as they could from the defendant's silence at the guilt-innocence stage of the trial. 'No judge can prevent jurors from speculating about why a defendant stands mute ..., but a judge can, and must, *if requested to do so,* use the unique jury instruction to reduce that speculation to a minimum.' See *Carter,* supra, [450] U.S. at page [288], 101 S.Ct. at 1113. (First emphasis supplied; second emphasis is in the original opinion.)

Also see *Stewart v. State*, 666 S.W.2d 548 (Tex.App.—5th 1984) (State's P.D.R. refused). Thus, before today, it was axiomatic as a matter of state law that under no circumstances could the failure to give the instruction, when requested, be harmless error. Today, however, a new majority of this Court applies to appellant's contention the harmless error test set out in *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 826-27, 17 L.Ed.2d 705 (1967), and finds that the error was harmless beyond a reasonable doubt. Given what this Court unequivocally stated and held in *Brown*, supra, I totally disagree with the majority opinion's holding that the error was harmless beyond a reasonable doubt. Furthermore, the State in this cause has not proved, beyond a reasonable doubt, that the error made no contribution to the affirmative answers that the jury returned to the special issues. See Rule 81(b)(2), *Tex.R.App.Proc.* Also see *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985), which held that where charge error is prop-

erly preserved, the defendant must only show "some" harm. It is obvious to me that without such an instruction in this cause the jurors were given a license to speculate on why appellant failed to testify at the punishment stage of his trial, and, because the State has not shown that none of the jurors did not so speculate, I must therefore assume that some, if not all of the jurors, did speculate. Furthermore, without such instruction, the prosecuting attorneys were given license to comment on appellant's failure to testify at the punishment stage of the trial. In this regard, because one of the prosecutors did directly comment on appellant's failure to testify at the punishment stage of the trial, it is not necessary to speculate on whether the prosecutors did or did not directly comment on appellant's failure to testify at the punishment stage of the trial. The record clearly reflects that one of the prosecuting attorneys in his final argument told the jury that appellant deserved a premature death because appellant had not shown the jury either remorse or any feelings of guilt.

This Court probably has more harmless error tests than any other supreme court in the nation. We have a harmless error test that was devised in *Almanza,* supra, for "normal" jury charge error; we have a harmless error test that is found in Rule 81(b)(2), for error committed in admitting evidence; we have a harmless error test where the jury charge was based upon an unconstitutional statute, see *Rose v. State,* 752 S.W.2d 529 (Tex.Cr.App.1988). Today, it creates another harmless error test. The majority opinion reasons that because *Brown,* supra, was based upon a decision of the United States Supreme Court, this Court is obligated to apply whatever harmless error test that the Supreme Court uses: "When an error implicates rights flowing from the United States Constitution, we must apply the harmless-error rule enunciated by the Supreme Court." (Page 432 of opinion).

I have no problem with any of the above.

Just recently, a majority of the Supreme Court of the United States in *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100

L.Ed.2d 284 (1988), held that in making the determination whether federal constitutional error in permitting a psychiatrist to testify at the punishment stage of the defendant's trial was harmless, "The question ... is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt' that the error did not contribute to the verdict obtained." 108 S.Ct. at 1798. Applying that holding to the charge error in this cause, it appears to me that the question here is not whether the legally admitted evidence was sufficient to support the death sentence, but rather, whether the State has proved "beyond a resonable doubt" that the error did not contribute to any of the affirmative answers that the jury returned on the submitted special issues.

In this instance, the State has clearly failed to establish beyond a reasonable doubt that the refusal of the trial judge to instruct the jury on appellant's failure to testify did not contribute to the affirmative answers that the jury returned to the special issues that were submitted to it to answer. Especially is this true as to the affirmative answer to special issue number 2.

Many of us have heard from former and present experienced prosecutors, as well as from many trial and appellate court judges, ministers, and social workers that the first step that the defendant must take towards rehabilitating himself, which is in part what second special issue asks, is for him to come forward, bare his soul, and repent in public for all of his sins and crimes that he has committed in the past. Whether this is a valid or rational statement is not the point; the point is that most lay persons actually believe the above statement.

Our statutory law, see Art. 38.08, V.A.C. C.P., prohibits a prosecutor from alluding to or commenting on a defendant's failure to testify at the guilt stage of the trial. It is the rare case in which a prosecutor's comment on the defendant's failure to testify will be deemed harmless error. Cf. *Mon-*

*toya v. State*, 744 S.W.2d 15 (Tex.Cr. App.1987) (On appellant's motion for rehearing).

In *Brown*, supra, the principle of law set out in Art. 38.08, V.A.C.C.P., was incorporated into the punishment stage of the trial. This Court held in *Brown*, supra, that, where requested, the trial judge should instruct the jury in a non-capital case that in deciding the punishment to be assessed the jury should not take into consideration the defendant's failure to testify. Mc Clung, in his *Jury Charges For Texas Criminal Practice*, 1987 revised edition, states the following: "If defendant did not testify in the penalty phase, court should instruct the jury on such failure if requested. It would be reversible error to refuse. Moss 632 S W (2) 344; Brown 617 S W (2) 234; Stewart 666 [S.W.] (2) 548." (230). Today, the majority opinion correctly holds that the holding in *Brown*, supra, is applicable to a death penalty punishment hearing, but in doing so also holds that failure or refusal of the trial judge to instruct the jury on the defendant's failure to testify can be harmless error.

Who is the person that can best tell us whether appellant will commit criminal acts of violence in the future? The answer, of course, is obvious. It is appellant himself who can best supply us with that answer. In fact, just recently in *Montoya*, supra, this Court so found: "The appellant was also the only one who could testify as to whether 'I'm going to commit acts of violence in the future.'" (744 S.W.2d at 36). All other persons who testify on the issue of future dangerousness are either just speculating, or, in the case of the likes of Drs. Grigson, Griffith, and Schroeder, just making an educated guess the defendant will in the future commit criminal acts of violence that will constitute a continuing threat to society.

The majority opinion states in footnote 17 that "Aside from a plea for mercy, which was made by appellant's mother, we can think of nothing else that appellant could have said during the punishment phase that he had not already said [at the guilt stage of the trial]." I thought *Mon-*

*toya, supra,* taught us that that statement is clearly erroneous.

It is true that at the guilt stage of the trial appellant informed the jury about certain things. It is also true that there is no provision in our law for the defendant to testify over objection at the guilt stage of the trial that he wants mercy from the jury; that he will not in the future commit criminal acts of violence that would constitute a continuing threat to society; that he is remorseful; that he acknowledges all of his former transgressions; and that he has entered into a truce with sin. Nor can he perform at the guilt stage of the trial as Reverend Jimmy Swaggart did on national television. That kind of testimony can only be adduced at the punishment stage of the trial, and only the defendant himself can testify that he is now on the road that is free of sin and that he will not in the future commit criminal acts of violence that would constitute a continuing threat to society.

The majority opinion is just dead wrong when it states that appellant could not have said more during the punishment phase that might have persuaded the jury to return a negative answer to the second special issue. The majority opinion is just merely speculating from its appellate perch where it states that "Aside from a plea of mercy, which was made by appellant's mother, we can think of nothing else that appellant could have said during the punishment phase that he had not already said."

In holding that the error was harmless, I believe that what the author of the majority opinion, on behalf of himself and those who join his opinion, is really saying is that the error would not have affected *his* own decision or would not have contributed to *his* own verdict had he been on the jury. He cannot, however, without speculating, state why he believes it did not affect the jurors in this cause. Also see *Black v. State,* 723 S.W.2d 674, 682 (Tex.Cr.App. 1986) (Teague, J., dissenting opinion).

Because the author of the majority opinion appears to place so much emphasis upon appellant's mother's plea for mercy, in making the determination that the error was harmless, I am compelled to ask this question: Had Reverend Swaggart sent his mother, rather than himself to testify on national television, and had she asked the audience for forgiveness for her son, how much of an impact would this have had on the audience?

In this instance, I suspect that before each and every member of this Trinity County jury decided to answer the second special issue in the affirmative, deep down in their hearts, they wanted appellant to perform much like Reverend Swaggart did on national television, and because he did not testify at the punishment stage of the trial, and also because they were not told by the trial judge that they could not draw an adverse inference from appellant's failure to testify, it is reasonable to assume that they did draw adverse inferences on appellant's failure to testify.

For good discussions on the role that the jury charge plays in a criminal trial in Texas, see *Benson v. State,* 661 S.W.2d 708 (Tex.Cr.App.1982) (Opinion on State's Second Motion for Rehearing), and *Doyle v. State,* 631 S.W.2d 732 (Opinion on State's Motion for Rehearing) ("We believe that the charge to a jury represents the distilled and abstracted wisdom of many trials, appeals, and teachings of many great legal minds, both past and present, whose attention has been riveted on the subject of instructions to the jury. The charge should resemble a gem that has been cut and polished by the hard edge of legal experience obtained from both within and without our criminal justice system.") (738).

Therefore, I expressly dissent to the majority opinion's overruling appellant's fifth point of error.