COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.  2-03-381-CR

 

 

MONTY WAYNE CAIN                                                          APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 372ND
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

Introduction








Appellant
was indicted for theft of a welder and concrete mixer from Home Depot.  He pleaded not guilty and was tried to a
jury.  The jury found Appellant guilty,
and the trial court sentenced him to fifteen months= confinement.  In two points, Appellant argues that the
independent evidence is insufficient to corroborate the accomplice testimony
and that the evidence is factually insufficient.  We affirm.

Factual and Procedural Background

During
its case, the State called as witnesses Steve Coffman, a Pro Account Sales
Associate at Home Depot; Jason Barker, the store manager; Robert Hood, the loss
prevention manager; Corporal Robert Howell of the Fort Worth Police Department;
and Joshua Gray, an order puller and Appellant=s accomplice. 

Coffman
testified that as a Pro Account Sales Associate at the Home Depot in Fort
Worth, he works at the Apro desk@ and exclusively assists
commercial contractors in placing and filling their orders.  While working in this capacity, Coffman met
Appellant and formed a business relationship with him and became the person
through whom Appellant would place orders. 
Appellant provided Coffman with his credit card number, which was
standard; however, Appellant insisted that Coffman not place his credit card
number in a file that could be accessed by other employees.  Therefore, Coffman maintained Appellant=s credit card number in a small
notebook that he kept in his Home Depot apron. 
Coffman kept the notebook in his apron whenever he worked and kept the
apron and notebook in a locked drawer when he was not working. 








Coffman
explained that generally if Appellant wished to add on to a phone order that he
had placed when he arrived at the store, Coffman could add the merchandise to
the order and ring it up separately. 
However, because Appellant=s credit card number was not on file, if Coffman was
unavailable and Appellant wished to add to an order, Appellant would have to
present his credit card or have a special services associate or manager get
into the computer system and find Appellant=s credit card number. 

Appellant=s accomplice, Joshua Gray, waived
his Fifth Amendment right not to testify as part of a plea bargain
agreement.  He stated that he first met
Appellant in late November 2002 at the Apro desk@ as Appellant was placing an order with Coffman, and he assisted
Appellant with his order.  Gray
testified that while he was assisting Appellant with his order, Appellant asked
Gray if he had a Ahook up at Home Depot.@ 
Gray stated that he understood Appellant to be asking whether he could
steal from Home Depot, and Gray told Appellant that he could.  Gray stated that Appellant asked him to steal
around $100 of lumber to add to the order that he had placed with Coffman.  Gray added the lumber to the cart, and he
and Appellant pushed the cart outside. 
Appellant did not pay for the additional lumber, but Appellant gave Gray
$40 or $50 after they finished loading Appellant=s vehicle. 








Gray
testified that two or three days later, Appellant returned to the store to pick
up an order he had placed and asked Gray to Athrow in some extra air compressors and generators,@ and Gray Awillingly loaded them up for him.@ Gray placed two air compressors,
a larger air compressor, and a generator in with Appellant=s order.  Gray stated that Appellant=s orders were typically very large, and it was easy to add
merchandise to his orders.  Gray
testified that Appellant did not pay for these additional items but gave Gray
$200.  Gray also testified that in the
beginning of December 2002, he again helped Appellant steal another air
compressor.  

Gray
testified that he received a phone call from Appellant on Thursday, December
12, 2002, and Appellant told him Ato be ready for Saturday.@  Gray
informed another employee, Robbie Harvey, who would also be working that
Saturday, to be Aheads-up@ because they might have Asome business to . . . tend to.@ 









Harvey
contacted Barker and informed him that Gray had been stealing merchandise with
an unidentified customer and they were planning to steal from the store on
Saturday.  Barker contacted Hood to
alert him to the information he had received from Harvey.  Barker, Hood, and another loss prevention
associate, Donnie Hamilton, met early that Saturday morning to devise a
surveillance plan.  They decided that
Hood would remain outside the store, Barker would monitor the interior of the
store through the surveillance cameras in the security room, and Hamilton would
stay on the floor inside the store.  All
three were able to maintain contact through walkie-talkies and a cell phone. 

Gray
saw Appellant arrive on Saturday morning to drop off a turkey to the Apro desk@ employees.  Gray met with Appellant at that time, and
Appellant told him that he would need a concrete mixer and informed Gray that
he was going to place a Awill-call order@ that he would pick up later in
the day. 








While
Barker was watching Gray through the surveillance cameras that morning, he saw
Gray Amilling around@ while Appellant spoke with
Coffman, and then saw Gray approach Appellant after Appellant finished speaking
with Coffman.  Appellant and Gray shook
hands, conversed briefly, separated, and then met up again a few minutes
later.  Barker testified that he
recognized Appellant as a frequent customer, although at the time he did not
know who he was.  Barker stated that as
he was following Gray with the surveillance camera, Harvey contacted him and
informed him that the man that Gray was talking to was the person for whom Gray
was going to steal, and that they planned to steal a concrete mixer.  Barker observed Appellant and Gray exit the
store towards the area where the concrete mixers were kept.  Barker stated that he continued to receive
updates from Harvey, who was with Gray as he spoke with Appellant.  Harvey informed Barker that Appellant left
to retrieve his trailer.  At
approximately 11:30 a.m., Harvey told Barker that Gray was going to meet
Appellant for lunch because, according to Harvey, Appellant wanted to discuss
adding something else to his order. 

Coffman
testified that Appellant called him at approximately 11 a.m. and placed an
order consisting of lumber, concrete blocks, concrete mix, and saw blades.  Coffman entered these items into the
computer and charged Appellant=s credit card at that time for $226.81.  Coffman printed out a Apick list@ that was given to Gray and Harvey so that they could pull the items
Appellant had ordered and prepare them for pick up.  According to Coffman, Appellant was going to pick up his order at
approximately 1:30 p.m.  Coffman stated
that at that time, the Apro desk@ was only open until 1 p.m., and
he left work around that time.  On his
way home, Coffman called Appellant on his cell phone and informed him that his
order would be ready by 1:30.  Coffman
stated that Appellant had not ordered a welder or a concrete mixer.  

Gray
stated that soon after he and Harvey had pulled Appellant=s order, Appellant called him on
his cell phone and asked him to meet Appellant across the street for
lunch.  Gray told Harvey that he was
going to meet Appellant for lunch.  Gray
arrived at the restaurant and waited for Appellant in his truck.  When Appellant arrived, the two shook hands
and went into the restaurant. 








Hood
testified that because he had received information that Gray was going to meet
Appellant for lunch, he decided to follow Gray to observe this meeting.  Hood stated that he followed Gray across the
street to a pizza restaurant and positioned his vehicle at a gas station
nearby.  Hood observed Gray sitting in
his car for a couple of minutes, and then saw Appellant pull into the parking
lot.  Appellant and Gray conversed
briefly outside, and then entered the restaurant, where they remained for
approximately forty-five minutes.  Hood
stated that he observed Appellant and Gray exit the restaurant, speak again
briefly outside, and then watched as Appellant and Gray left in their vehicles.
Hood explained that on a professional basis it would be unusual for an order
puller, such as Gray, to have lunch with a customer. 








Gray
stated that while at the restaurant, Appellant asked him to also steal a welder
to replace one that had failed. 
Appellant and Gray discussed what type of welder Appellant needed, and
they agreed that Gray would select one, Appellant would inspect it and make
sure it was the one he wanted, and Gray would place it with Appellant=s order.  Gray also testified that he and Appellant went over their plan
regarding the cement mixer.  They
decided that Appellant would pull his trailer close to the building, and after
Gray loaded the other items, Gray would then place the cement mixer on the
trailer.  Gray testified that because of
the high risk of getting caught stealing a concrete mixer, a large, expensive
item, Appellant and he devised a cover story. 
They decided that if they were questioned, they would claim that the
stolen items were intended to be charged to Appellant=s credit card.  Gray stated that as they left lunch,
Appellant paid him $80 for the air compressor that he had stolen a few days
before, and Gray expected to be paid for assisting Appellant in stealing the
concrete mixer and welder. 








Gray
said he then returned to the store and went to the Atool corral@ where the power tools were stored
and selected a welder that he thought Appellant would like.  Gray left it sticking out so Appellant could
see it and returned to the Apro desk@ where he closed out Appellant=s order.  Gray testified that he did not add a concrete mixer or a welder
to Appellant=s order, nor did he create a new
order for these items.  Gray stated that
approximately ten to fifteen minutes later, Appellant re-entered the store and
went to inspect the welder that he had selected.  Appellant told Gray that the welder was fine and Ato go ahead and just get it.@ 
Gray retrieved the welder, placed it on the cart with Appellant=s other items, and placed a Apaid@ sticker on the welder so that it appeared it had
been paid for.  Appellant and Gray then
pushed the cart outside and loaded the items onto Appellant=s trailer.  Gray then loaded the concrete mixer onto the
trailer with the use of a forklift while Appellant watched.  Gray was called to assist another customer
and did not see Appellant leave.  Gray
stated that as he was helping another customer load concrete, Appellant called
him on his cell phone and told him that he had been pulled over by the police
for what he thought was the stolen merchandise, and Appellant reminded Gray
about their cover story. 

Barker
testified that as he continued to watch the store through the surveillance
cameras, he observed Gray return to the store between 12:30 and 1:00 p.m.  Barker saw Gray enter the store near the
contractor area and go directly towards the Atool corral@ area where he looked at the welders for approximately
fifteen seconds and then walked away. 
Barker then saw Appellant enter the store and go directly to the welder
area where Gray had been, where he stayed for a short time before meeting up
with Gray at the contractor=s desk.  Barker then watched
Gray walk back to the Atool corral,@ select a welder, and place the
welder on Appellant=s cart.  Barker saw Gray transfer a paid sticker from the lumber to the
welder.  Barker then observed as Gray
and Appellant both pushed the cart outside the store.   








Barker
immediately checked the computer to see if Appellant had paid for the welder
and verified that the welder was not among Appellant=s order and had not been paid
for.  Barker testified that for
Appellant to have paid for the welder, he would have had to separately pay for
it at a register, or his entire order would have to be refunded to him and the
entire order entered again adding the welder. 
Barker stated that no attempt was made to pay for the welder.  Barker valued the welder at $329. 

Barker
notified Hood, who was outside the store, that Appellant had taken a welder
that had not been paid for.  Hood
testified that he watched as Appellant and Gray loaded the welder into the bed
of Appellant=s pickup truck.  Hood also observed Gray place the concrete
mixer onto Appellant=s trailer with the use of a
forklift and verified with Barker that the mixer had also not been paid
for.  The concrete mixer was valued at
approximately $2,000.  As Appellant
drove off, Hood called the police on his cell phone and reported the theft of
the welder and concrete mixer. 








Corporal
Robert Howell of the Fort Worth Police Department testified that he was called
to the Home Depot to assist on a suspected theft between an employee and a
customer.  Howell met with Hood and gave
him his cell phone number so that Hood could keep him updated.  Howell stated that Hood contacted him and
advised him that the concrete mixer had been loaded onto Appellant=s trailer, and Appellant was
headed south on the freeway access road. 
Howell stated that he and another officer stopped Appellant, and Howell
informed Appellant that he had been stopped because he was investigating a
theft from the Home Depot.  Appellant
produced several receipts, but only one had the date of December 14, 2002 on
it.  Howell stated that lumber, cement,
saw blades, and concrete blocks were the only items listed on the receipt.
Howell testified that the welder was inside the bed of Appellant=s pickup truck, and the concrete
mixer was on a flatbed trailer that Appellant was towing.  Howell verified that neither of these items
were on Appellant=s receipt. Appellant and Gray were
subsequently arrested.  

Denise
Slack, the wife of one of Appellant=s employees, testified for the defense.  She testified that she and her husband met
Appellant at the Home Depot on December 14. 
Denise stated that her husband was meeting Appellant at the store to
discuss welders with him.  Denise
testified that she was sure that Appellant had paid for the welder, although
she was not present when she believed it had been purchased.  On cross-examination, Denise stated that she
did not personally observe Appellant pay for the welder.  The only reason Denise believed Appellant
had paid for the welder was because Appellant told her he bought the welder and
the concrete mixer while they were being loaded onto his truck. 








Albert
Slack also testified that on December 14, he called Appellant about getting a
welder.  Albert stated that he was
passing by the Home Depot and decided to stop in to look at welders and
Appellant happened to be at the store. Albert testified that Appellant and he
looked at the welders and that he overheard Appellant tell an employee to put
the welder on his credit card. However, he acknowledged on cross-examination
that he never saw Appellant pay for the welder, nor did he see a receipt. 

Accomplice Testimony

In
his first point, Appellant argues that there is insufficient evidence to
corroborate the accomplice testimony of Gray. 
First, we note that Appellant relies on article 38.14 of the code of
criminal procedure, while the State argues that the corroboration should be
reviewed according to section 31.03(c)(2) of the penal code. 








Section
31.03(c)(2) of the Texas Penal Code requires the State to corroborate the
testimony of an accomplice that tends to connect the defendant to the
crime;  however, the accomplice
testimony need not be corroborated to establish the defendant=s knowledge or intent.  Lee v. State, 29 S.W.3d 570, 576 (Tex.
App.CDallas 2000, no pet.); see Tex. Penal Code Ann. ' 31.03(c)(2) (Vernon Supp.
2004-05).[2]  The remedy for the State=s failure to sufficiently
corroborate accomplice witness testimony when required is the defendant=s acquittal.  Cathey v. State, 992 S.W.2d 460, 463
n.2 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).








In
conducting a sufficiency review under the accomplice-witness rule, the
reviewing court must eliminate the accomplice testimony from consideration and
then examine the remaining portions of the record to ascertain if there is any
evidence that tends to connect the accused with the commission of the
crime.  Solomon v. State, 49
S.W.3d 356, 361 (Tex. Crim. App. 2001); Hernandez v. State, 939 S.W.2d
173, 176 (Tex. Crim. App. 1997).  ATendency to connect@ rather than rational sufficiency
is the standard:  the corroborating
evidence need not be sufficient by itself to establish guilt beyond a
reasonable doubt.  Solomon, 49
S.W.3d at 361; Cathey, 992 S.W.2d at 462.  Nor is it necessary for the corroborating evidence to directly
link the accused to the commission of the offense.  Cathey, 992 S.W.2d at 462.  The accomplice-witness rule is a statutorily-imposed sufficiency
review and is not derived from federal or state constitutional principles that
define the legal and factual sufficiency standards.  Id. at 462-63.  To
satisfy the accomplice-witness rule, there simply needs to be other evidence
tending to connect the accused to the commission of the offense.  See id. at 463.  Any independent evidence tending to verify
an accomplice witness=s version rather than the
defendant=s version is deemed to be
corroborative, even if it goes only to Aa mere >detail=@ versus a substantive connection
between the defendant and the offense.  See
Nethery v. State, 29 S.W.3d 178, 185-86 (Tex. App.CDallas 2000, pet. ref=d) (quoting Beathard v. State,
767 S.W.2d 423, 430 (Tex. Crim. App. 1989), cert. denied, 528 U.S. 954
(1999).








Appellant
is correct that in addition to eliminating Gray=s testimony, we must also eliminate the testimony
of Barker regarding the information he learned through Harvey.  Hearsay from an accomplice cannot
corroborate the accomplice=s trial testimony; i.e., an accomplice cannot corroborate himself by
his own statements made to third persons. 
McDuff v. State, 939 S.W.2d 607, 612 (Tex. Crim. App.), cert.
denied, 522 U.S. 844 (1997). 
Therefore, we will eliminate from consideration testimony regarding Gray=s out-of-court statements to
Harvey.

After
examining the evidence detailed above, we conclude that the testimony of
Barker, Hood, and Corporal Howell of the Fort Worth Police Department was
nonaccomplice evidence sufficient to corroborate Gray=s in-court testimony.  Barker observed Appellant speaking with Gray
on the morning of the offense.  After
Gray and Appellant=s lunch meeting, Barker observed
Gray return and go directly to the welders and saw Appellant return a short
time later and also go directly to the welders.  Barker saw Appellant and Gray meet up and then watched as Gray
selected a welder, placed a paid sticker on it, and put it on the cart with
Appellant=s order.  Barker watched as both Gray and Appellant pushed the cart out of
the store without paying for the welder. 
Additionally, Hood observed as Gray used a forklift to place a concrete
mixer on Appellant=s trailer as Appellant stood by
and watched.  Again, no attempt was made
to pay for this large item.  Barker
testified that Appellant=s actual order totaled $226.81,
and the welder and concrete mixer totaled over $2,200.  Finally, Appellant was stopped after he had
left the premises of Home Depot and was in possession of these items that had
not been paid for. 








Although
some of the nonaccomplice evidence is Amere detail,@ it is clearly sufficient to connect Appellant with the
offense.  Therefore, Gray=s testimony was sufficiently
corroborated.  We overrule Appellant=s first point.

Factual Sufficiency








In
his second point, Appellant challenges the factual sufficiency of the
evidence.  In reviewing the factual
sufficiency of the evidence to support a conviction, we are to view all the
evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App.
2004).  The only question to be answered
in a factual sufficiency review is whether, considering the evidence in a
neutral light, the fact finder was rationally justified in finding guilt beyond
a reasonable doubt.  Id. at
484.  There are two ways evidence may be
factually insufficient:  (1) the
evidence supporting the verdict or judgment, considered by itself, is too weak
to support the finding of guilt beyond a reasonable doubt; or (2) when there is
evidence both supporting and contradicting the verdict or judgment, weighing
all of the evidence, the contrary evidence is so strong that guilt cannot be
proven beyond a reasonable doubt.  Id.
at 484-85.  AThis standard acknowledges that
evidence of guilt can >preponderate= in favor of conviction but still
be insufficient to prove the elements of the crime beyond a reasonable doubt.@ 
Id. at 485.  In other
words, evidence supporting a guilty finding can outweigh the contrary proof but
still be insufficient to prove the elements of an offense beyond a reasonable
doubt.  Id.  In
performing a factual sufficiency review, we are to give deference to the fact
finder=s determinations, including
determinations involving the credibility and demeanor of witnesses.  Id. at 481; Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997). 
We may not substitute our judgment for that of the fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A
proper factual sufficiency review requires an examination of all the
evidence.  Id. at 484,
486-87.  An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal. 
Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

After
examining the evidence as detailed above, we conclude that the jury was
rationally justified in finding guilt beyond a reasonable doubt.  Although Appellant contends that the
testimony of the Slacks showed that Appellant intended to pay for the welder
and concrete mixer, we are to give deference to the jury=s determinations involving the
credibility and demeanor of witnesses and may not substitute our judgment for
that of the jury=s.  Zuniga, 144 S.W.3d at 481-82.  Accordingly, we hold that the evidence was factually sufficient
to support Appellant=s conviction.  We overrule Appellant=s second point.








Conclusion

Having
overruled all of Appellant=s points, we affirm the trial court=s judgment.

 

 

ANNE GARDNER

JUSTICE

 

PANEL A:  CAYCE, C.J.; DAUPHINOT AND GARDNER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED:  October 20, 2005











[1]See Tex. R.
App. P. 47.4.





[2]Article 38.14 provides that

 

[a] conviction cannot be had upon
the testimony of an accomplice unless corroborated by other evidence tending to
connect the defendant with the offense committed; and the corroboration is not
sufficient if it merely shows the commission of the offense.

 

Tex. Code
Crim. Proc. Ann. art.
38.14 (Vernon 2005). 

 

Therefore,
both article 38.14 and section 31.03(c)(2) of the penal code require evidence
that tends to connect the accused with the crime charged.  After examining the caselaw, we conclude
that the same standard of review is applied under either statute in the context
of this case.  See Lee, 29 S.W.3d
at 577.