CAIN V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-03-381-CR

MONTY WAYNE CAIN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Introduction

Appellant was indicted for theft of a welder and concrete mixer from Home Depot.  He pleaded not guilty and was tried to a jury.  The jury found Appellant guilty, and the trial court sentenced him to fifteen months’ confinement.  In two points, Appellant argues that the independent evidence is insufficient to corroborate the accomplice testimony and that the evidence is factually insufficient.  We affirm.

Factual and Procedural Background

During its case, the State called as witnesses Steve Coffman, a Pro Account Sales Associate at Home Depot; Jason Barker, the store manager; Robert Hood, the loss prevention manager; Corporal Robert Howell of the Fort Worth Police Department; and Joshua Gray, an order puller and Appellant’s accomplice. 

Coffman testified that as a Pro Account Sales Associate at the Home Depot in Fort Worth, he works at the “pro desk” and exclusively assists commercial contractors in placing and filling their orders.  While working in this capacity, Coffman met Appellant and formed a business relationship with him and became the person through whom Appellant would place orders.  Appellant provided Coffman with his credit card number, which was standard; however, Appellant insisted that Coffman not place his credit card number in a file that could be accessed by other employees.  Therefore, Coffman maintained Appellant’s credit card number in a small notebook that he kept in his Home Depot apron.  Coffman kept the notebook in his apron whenever he worked and kept the apron and notebook in a locked drawer when he was not working. 

Coffman explained that generally if Appellant wished to add on to a phone order that he had placed when he arrived at the store, Coffman could add the merchandise to the order and ring it up separately.  However, because Appellant’s credit card number was not on file, if Coffman was unavailable and Appellant wished to add to an order, Appellant would have to present his credit card or have a special services associate or manager get into the computer system and find Appellant’s credit card number. 

Appellant’s accomplice, Joshua Gray, waived his Fifth Amendment right not to testify as part of a plea bargain agreement.  He stated that he first met Appellant in late November 2002 at the “pro desk” as Appellant was placing an order with Coffman, and he assisted Appellant with his order.  Gray testified that while he was assisting Appellant with his order, Appellant asked Gray if he had a “hook up at Home Depot.”  Gray stated that he understood Appellant to be asking whether he could steal from Home Depot, and Gray told Appellant that he could.  Gray stated that Appellant asked him to steal around $100 of lumber to add to the order that he had placed with Coffman.  Gray added the lumber to the cart, and he and Appellant pushed the cart outside.  Appellant did not pay for the additional lumber, but Appellant gave Gray $40 or $50 after they finished loading Appellant’s vehicle. 

Gray testified that two or three days later, Appellant returned to the store to pick up an order he had placed and asked Gray to “throw in some extra air compressors and generators,” and Gray “willingly loaded them up for him.” Gray placed two air compressors, a larger air compressor, and a generator in with Appellant’s order.  Gray stated that Appellant’s orders were typically very large, and it was easy to add merchandise to his orders.  Gray testified that Appellant did not pay for these additional items but gave Gray $200.  Gray also testified that in the beginning of December 2002, he again helped Appellant steal another air compressor.  

Gray testified that he received a phone call from Appellant on Thursday, December 12, 2002, and Appellant told him “to be ready for Saturday.”  Gray informed another employee, Robbie Harvey, who would also be working that Saturday, to be “heads-up” because they might have “some business to . . . tend to.”  

Harvey contacted Barker and informed him that Gray had been stealing merchandise with an unidentified customer and they were planning to steal from the store on Saturday.  Barker contacted Hood to alert him to the information he had received from Harvey.  Barker, Hood, and another loss prevention associate, Donnie Hamilton, met early that Saturday morning to devise a surveillance plan.  They decided that Hood would remain outside the store, Barker would monitor the interior of the store through the surveillance cameras in the security room, and Hamilton would stay on the floor inside the store.  All three were able to maintain contact through walkie-talkies and a cell phone. 

Gray saw Appellant arrive on Saturday morning to drop off a turkey to the “pro desk” employees.  Gray met with Appellant at that time, and Appellant told him that he would need a concrete mixer and informed Gray that he was going to place a “will-call order” that he would pick up later in the day. 

While Barker was watching Gray through the surveillance cameras that morning, he saw Gray “milling around” while Appellant spoke with Coffman, and then saw Gray approach Appellant after Appellant finished speaking with Coffman.  Appellant and Gray shook hands, conversed briefly, separated, and then met up again a few minutes later.  Barker testified that he recognized Appellant as a frequent customer, although at the time he did not know who he was.  Barker stated that as he was following Gray with the surveillance camera, Harvey contacted him and informed him that the man that Gray was talking to was the person for whom Gray was going to steal, and that they planned to steal a concrete mixer.  Barker observed Appellant and Gray exit the store towards the area where the concrete mixers were kept.  Barker stated that he continued to receive updates from Harvey, who was with Gray as he spoke with Appellant.  Harvey informed Barker that Appellant left to retrieve his trailer.  At approximately 11:30 a.m., Harvey told Barker that Gray was going to meet Appellant for lunch because, according to Harvey, Appellant wanted to discuss adding something else to his order. 

Coffman testified that Appellant called him at approximately 11 a.m. and placed an order consisting of lumber, concrete blocks, concrete mix, and saw blades.  Coffman entered these items into the computer and charged Appellant’s credit card at that time for $226.81.  Coffman printed out a “pick list” that was given to Gray and Harvey so that they could pull the items Appellant had ordered and prepare them for pick up.  According to Coffman, Appellant was going to pick up his order at approximately 1:30 p.m.  Coffman stated that at that time, the “pro desk” was only open until 1 p.m., and he left work around that time.  On his way home, Coffman called Appellant on his cell phone and informed him that his order would be ready by 1:30.  Coffman stated that Appellant had not ordered a welder or a concrete mixer.  

Gray stated that soon after he and Harvey had pulled Appellant’s order, Appellant called him on his cell phone and asked him to meet Appellant across the street for lunch.  Gray told Harvey that he was going to meet Appellant for lunch.  Gray arrived at the restaurant and waited for Appellant in his truck.  When Appellant arrived, the two shook hands and went into the restaurant. 

Hood testified that because he had received information that Gray was going to meet Appellant for lunch, he decided to follow Gray to observe this meeting.  Hood stated that he followed Gray across the street to a pizza restaurant and positioned his vehicle at a gas station nearby.  Hood observed Gray sitting in his car for a couple of minutes, and then saw Appellant pull into the parking lot.  Appellant and Gray conversed briefly outside, and then entered the restaurant, where they remained for approximately forty-five minutes.  Hood stated that he observed Appellant and Gray exit the restaurant, speak again briefly outside, and then watched as Appellant and Gray left in their vehicles. Hood explained that on a professional basis it would be unusual for an order puller, such as Gray, to have lunch with a customer. 

Gray stated that while at the restaurant, Appellant asked him to also steal a welder to replace one that had failed.  Appellant and Gray discussed what type of welder Appellant needed, and they agreed that Gray would select one, Appellant would inspect it and make sure it was the one he wanted, and Gray would place it with Appellant’s order.  Gray also testified that he and Appellant went over their plan regarding the cement mixer.  They decided that Appellant would pull his trailer close to the building, and after Gray loaded the other items, Gray would then place the cement mixer on the trailer.  Gray testified that because of the high risk of getting caught stealing a concrete mixer, a large, expensive item, Appellant and he devised a cover story.  They decided that if they were questioned, they would claim that the stolen items were intended to be charged to Appellant’s credit card.  Gray stated that as they left lunch, Appellant paid him $80 for the air compressor that he had stolen a few days before, and Gray expected to be paid for assisting Appellant in stealing the concrete mixer and welder. 

Gray said he then returned to the store and went to the “tool corral” where the power tools were stored and selected a welder that he thought Appellant would like.  Gray left it sticking out so Appellant could see it and returned to the “pro desk” where he closed out Appellant’s order.  Gray testified that he did not add a concrete mixer or a welder to Appellant’s order, nor did he create a new order for these items.  Gray stated that approximately ten to fifteen minutes later, Appellant re-entered the store and went to inspect the welder that he had selected.  Appellant told Gray that the welder was fine and “to go ahead and just get it.”  Gray retrieved the welder, placed it on the cart with Appellant’s other items, and placed a “paid” sticker on the welder so that it appeared it had been paid for.  Appellant and Gray then pushed the cart outside and loaded the items onto Appellant’s trailer.  Gray then loaded the concrete mixer onto the trailer with the use of a forklift while Appellant watched.  Gray was called to assist another customer and did not see Appellant leave.  Gray stated that as he was helping another customer load concrete, Appellant called him on his cell phone and told him that he had been pulled over by the police for what he thought was the stolen merchandise, and Appellant reminded Gray about their cover story. 

Barker testified that as he continued to watch the store through the surveillance cameras, he observed Gray return to the store between 12:30 and 1:00 p.m.  Barker saw Gray enter the store near the contractor area and go directly towards the “tool corral” area where he looked at the welders for approximately fifteen seconds and then walked away.  Barker then saw Appellant enter the store and go directly to the welder area where Gray had been, where he stayed for a short time before meeting up with Gray at the contractor’s desk.  Barker then watched Gray walk back to the “tool corral,” select a welder, and place the welder on Appellant’s cart.  Barker saw Gray transfer a paid sticker from the lumber to the welder.  Barker then observed as Gray and Appellant both pushed the cart outside the store.   

Barker immediately checked the computer to see if Appellant had paid for the welder and verified that the welder was not among Appellant’s order and had not been paid for.  Barker testified that for Appellant to have paid for the welder, he would have had to separately pay for it at a register, or his entire order would have to be refunded to him and the entire order entered again adding the welder.  Barker stated that no attempt was made to pay for the welder.  Barker valued the welder at $329. 

Barker notified Hood, who was outside the store, that Appellant had taken a welder that had not been paid for.  Hood testified that he watched as Appellant and Gray loaded the welder into the bed of Appellant’s pickup truck.  Hood also observed Gray place the concrete mixer onto Appellant’s trailer with the use of a forklift and verified with Barker that the mixer had also not been paid for.  The concrete mixer was valued at approximately $2,000.  As Appellant drove off, Hood called the police on his cell phone and reported the theft of the welder and concrete mixer. 

Corporal Robert Howell of the Fort Worth Police Department testified that he was called to the Home Depot to assist on a suspected theft between an employee and a customer.  Howell met with Hood and gave him his cell phone number so that Hood could keep him updated.  Howell stated that Hood contacted him and advised him that the concrete mixer had been loaded onto Appellant’s trailer, and Appellant was headed south on the freeway access road.  Howell stated that he and another officer stopped Appellant, and Howell informed Appellant that he had been stopped because he was investigating a theft from the Home Depot.  Appellant produced several receipts, but only one had the date of December 14, 2002 on it.  Howell stated that lumber, cement, saw blades, and concrete blocks were the only items listed on the receipt. Howell testified that the welder was inside the bed of Appellant’s pickup truck, and the concrete mixer was on a flatbed trailer that Appellant was towing.  Howell verified that neither of these items were on Appellant’s receipt. Appellant and Gray were subsequently arrested.  

Denise Slack, the wife of one of Appellant’s employees, testified for the defense.  She testified that she and her husband met Appellant at the Home Depot on December 14.  Denise stated that her husband was meeting Appellant at the store to discuss welders with him.  Denise testified that she was sure that Appellant had paid for the welder, although she was not present when she believed it had been purchased.  On cross-examination, Denise stated that she did not personally observe Appellant pay for the welder.  The only reason Denise believed Appellant had paid for the welder was because Appellant told her he bought the welder and the concrete mixer while they were being loaded onto his truck. 

Albert Slack also testified that on December 14, he called Appellant about getting a welder.  Albert stated that he was passing by the Home Depot and decided to stop in to look at welders and Appellant happened to be at the store. Albert testified that Appellant and he looked at the welders and that he overheard Appellant tell an employee to put the welder on his credit card. However, he acknowledged on cross-examination that he never saw Appellant pay for the welder, nor did he see a receipt. 

Accomplice Testimony

In his first point, Appellant argues that there is insufficient evidence to corroborate the accomplice testimony of Gray.  First, we note that Appellant relies on article 38.14 of the code of criminal procedure, while the State argues that the corroboration should be reviewed according to section 31.03(c)(2) of the penal code. 

Section 31.03(c)(2) of the Texas Penal Code requires the State to corroborate the testimony of an accomplice that tends to connect the defendant to the crime;  however, the accomplice testimony need not be corroborated to establish the defendant’s knowledge or intent. 
 Lee v. State
, 29 S.W.3d 570, 576 (Tex. App.—Dallas 2000, no pet.); 
see
 
Tex. Penal Code Ann.
 § 31.03(c)(2) (Vernon Supp. 2004-05).
(footnote: 2)  The remedy for the State’s failure to sufficiently corroborate accomplice witness testimony when required is the defendant’s acquittal.  
Cathey v. State
, 992 S.W.2d 460, 463 n.2 (Tex. Crim. App. 1999), 
cert. denied
, 528 U.S. 1082 (2000).

In conducting a sufficiency review under the accomplice-witness rule, the reviewing court must eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to ascertain if there is any evidence that tends to connect the accused with the commission of the crime.  
Solomon v. State
, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); 
Hernandez v. State
, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997).  “Tendency to connect” rather than rational sufficiency is the standard:  the corroborating evidence need not be sufficient by itself to establish guilt beyond a reasonable doubt.  
Solomon
, 49 S.W.3d at 361; 
Cathey
, 992 S.W.2d at 462
.  Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense.  
Cathey
, 992 S.W.2d at 462.  The accomplice-witness rule is a statutorily-imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards.  
Id.
 at 462-63.  To satisfy the accomplice-witness rule, there simply needs to be other evidence tending to connect the accused to the commission of the offense.  
See id.
 at 463.
  Any independent evidence tending to verify an accomplice witness’s version rather than the defendant’s version is deemed to be corroborative, even if it goes only to “a mere ‘detail’” versus a substantive connection between the defendant and the offense.  
See Nethery v. State
, 29 S.W.3d 178, 185-86 (Tex. App.—Dallas 2000, pet. ref’d) (quoting 
Beathard v. State
, 767 S.W.2d 423, 430 (Tex. Crim. App. 1989), 
cert. denied
, 528 U.S. 954 (1999)
.

Appellant is correct that in addition to eliminating Gray’s testimony, we must also eliminate the testimony of Barker regarding the information he learned through Harvey.  Hearsay from an accomplice cannot corroborate the accomplice’s trial testimony; i.e., an accomplice cannot corroborate himself by his own statements made to third persons.  
McDuff v. State
, 939 S.W.2d 607, 612 (Tex. Crim. App.), 
cert. denied
, 522 U.S. 844 (1997).  Therefore, we will eliminate from consideration testimony regarding Gray’s out-of-court statements to Harvey.

After examining the evidence detailed above, we conclude that the testimony of Barker, Hood, and Corporal Howell of the Fort Worth Police Department was nonaccomplice evidence sufficient to corroborate Gray’s in-court testimony.  Barker observed Appellant speaking with Gray on the morning of the offense.  After Gray and Appellant’s lunch meeting, Barker observed Gray return and go directly to the welders and saw Appellant return a short time later and also go directly to the welders.  Barker saw Appellant and Gray meet up and then watched as Gray selected a welder, placed a paid sticker on it, and put it on the cart with Appellant’s order.  Barker watched as both Gray and Appellant pushed the cart out of the store without paying for the welder.  Additionally, Hood observed as Gray used a forklift to place a concrete mixer on Appellant’s trailer as Appellant stood by and watched.  Again, no attempt was made to pay for this large item.  Barker testified that Appellant’s actual order totaled $226.81, and the welder and concrete mixer totaled over $2,200.  Finally, Appellant was stopped after he had left the premises of Home Depot and was in possession of these items that had not been paid for. 

Although some of the nonaccomplice evidence is “mere detail,” it is clearly sufficient to connect Appellant with the offense.  Therefore, Gray’s testimony was sufficiently corroborated.  We overrule Appellant’s first point.

Factual Sufficiency

In his second point, Appellant challenges the factual sufficiency of the evidence.  
In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

After examining the evidence as detailed above, we conclude that the jury 
was rationally justified in finding guilt beyond a reasonable doubt.  Although Appellant contends that the testimony of the Slacks showed that Appellant intended to pay for the welder and concrete mixer, we
 are to give deference to the jury’s determinations involving the credibility and demeanor of witnesses
 and 
may not substitute our judgment for that of the jury’s
.  
Zuniga
, 144 S.W.3d at 481-82.  Accordingly, we hold that the evidence was factually sufficient to support Appellant’s conviction.  We overrule Appellant’s second point.

Conclusion

Having overruled all of Appellant’s points, we affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL A:  CAYCE, C.J.; DAUPHINOT AND GARDNER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  October 20, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Article 38.14 provides that

[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex. Code Crim. Proc. Ann.
 art. 38.14 (Vernon 2005). 

 

Therefore, both article 38.14 and section 31.03(c)(2) of the penal code require evidence that tends to connect the accused with the crime charged.  After examining the caselaw, we conclude that the same standard of review is applied under either statute in the context of this case.  
See Lee
, 29 S.W.3d at 577.