ACCEPTED
06-14-00224-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
4/1/2015 11:51:17 AM
DEBBIE AUTREY
CLERK

IN THE

COURT OF APPEALS

FOR THE SIXTH DISTRICT OF TEXAS

AT DALLAS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
4/1/2015 11:51:17 AM

DEBBIE AUTREY
Clerk

---

FRANJESSICA WILLIAMS
APPELLANT

V.

THE STATE OF TEXAS
APPELLEE

---

CAUSE NUMBER: 06-14-00224-CR

---

ON APPEAL FROM CAUSE NUMBER:  F14-00534
282ND DISTRICT COURT
OF DALLAS COUNTY, TEXAS

---

APPELLANT'S BRIEF

---

Allan Fishburn
State Bar Number 07049110
211 N. Record
Suite 450
Dallas, Texas 75202
(214) 761-9170
allanfishburn@yahoo.com

# IDENTITY OF THE COURT, PARTIES AND COUNSEL

THE COURT

Honorable Andy Chatham Judge
282nd District Court
Dallas County, Texas

PARTIES
FRANJESSICA WILLIAMS                              Appellant

THE STATE OF TEXAS                               State

COUNSEL
Ms. Eren Price
Assistant District Attorney                       Attorney for the State
Frank Crowley Courts Building
133 N. Riverfront Boulevard
Dallas, Texas 75207

Ms. Summer Elmazi
Assistant District Attorney                       Attorney for the State
Frank Crowley Courts Building
133 N. Riverfront Boulevard
Dallas, Texas 75207

Ms. Caroline Simone
101 S. Woodrow, Suite 102                         Attorney for the Defendant
Denton, Texas 75205

Mr. Jose Noriega
10300 N. Central Expressway                       Attorney for the Defendant
Dallas, Texas 75231

Mr. Allan Fishburn
211 North Record                                  Attorney for Appellant
Suite 450
Dallas, Texas 75202

# TABLE OF CONTENTS

IDENTITY OF THE PARTIES                                          2

TABLE OF CONTENTS                                               3

INDEX OF AUTHORITIES                                            5

STATEMENT OF THE CASE                                          7

ISSUES PRESENTED                                               8

STATEMENT OF FACTS                                            9

POINT OF ERROR NUMBER ONE

THE EVIDENCE IS INSUFFICIENT TO
PROVE THE CULPABLE MENTAL STATE                               28

SUMMARY OF ARGUMENT                                           28

ARGUMENT                                                      29

POINT OF ERROR NUMBER TWO

THE TRIAL COURT ERRED BY INFORMING
THE JURY ABOUT GOOD CONDUCT TIME                             32

SUMMARY OF ARGUMENT                                           32

ARGUMENT                                                      32

POINT OF ERROR NUMBER THREE

THE TRIAL COURT LACKED JURISDICTION
TO HEAR THE INSTANT CASE AND RENDER
A JUDGMENT BECAUSE THE CASE WAS NOT
TRANSFERRED TO ITS DOCKET                                    36

SUMMARY OF ARGUMENT 36

ARGUMENT 36

PRAYER 39

CERTIFICATE OF COMPLIANCE 39

CERTIFICATE OF SERVICE 39

# INDEX OF AUTHORITIES

## CASES

Almanza v. State, 686 S.W. 2d 157
(Tex. Crim. App. 1995)                                      33

Becthard v. State, 767 S.W. 2d 423
(Tex. Crim. App. 1989)                                      34

Exparte Seidel, 39 S.W. 3rd 221
(Tex. Crim. App. 2001)                                      37

Garcia v. State, 901 S.W. 2d 731
(Tex. App. – Houston [14th Dist.]1995)                      38

Heath v. State, 817 S.W. 2d 335
(Tex. Crim. App. 1991)                                      38

Hoang v. State, 872 S.W. 2d 694
(Tex. Crim. App. 1993)                                      37

Jackson v. Virginia, 4433 U.S. 307 (1979)                  29

Jimenez v. State, 32 S.W. 3rd 233
(Tex. Crim. App. 2000)                                      33, 34

Jimenez  v. State, 992 S.W. 2d 633
(Tex. App. – Houston [1st. Dist.]1999)                      33

Marin v. State, 851 S.W. 2d 275
(Tex. Crim. App. 1993)                                      38

Mills v. State, 742 S.W. 2d 832
(Tex. App. – Dallas 1987)                                   38

Ovalle v. State, 13 S.W. 3rd 774
(Tex. Crim. App. 2000)                                      34

Sparks v. State, WL 42285
(Tex. App. – Dallas 2001)                                   35

Warner v. State, Nos. P.D.-1680-05-P.D.-16801-05
(Tex. Crim. App. 2008)                                      35

**CONSTITUTIONS**

Tex. Const. Art. V. section 12 (b)                          36

**STATUTES**

Tex. Code Crim. Proc. Ann. Article 4.16                     37

Tex. Penal Code Ann. section 6.03                           30

Tex. Code Crim. Proc. Ann. Article 12.06                    36

Tex. Penal Code Ann. section 22.04 (a)(1)(b)(2)(1)(e)       29

Tex. Code Crim. Proc. Ann. article 32.01                    36

Tex. Code Crim. Proc. Ann. section 36.14                    33

Tex. Code Crim. Proc. Ann. section 36.17                    33

Tex. Code Crim. Proc. Ann. section 36.19                    33, 34

Tex. Code Crim. Proc. Ann. section 37.07 section 4 (a)      32

Tex. Govt. Code Ann. section 24.003                         37

Tex. Govt. Code Ann. section 508.149 (a)                    33

## STATEMENT OF THE CASE

Appellant was charged with injury to a child by an indictment which reads: In the name and by the authority of the State of Texas : The Grand Jury of Dallas County, State of Texas, duly organized at the July Term, A.D. 2014 of the 291st Judicial District Court, Dallas County, in said Court at said Term, do present that one Williams, Franjessica, Defendant, on or about the 25th day of June A.D., 2013 in the County of Dallas and said State, did unlawfully, then and there intentionally and knowingly by omission cause serious bodily injury to Juelz Lombard, a child 14 years of age or younger, hereinafter called complainant, by failing to provide adequate hydration to complainant and by failing to seek adequate medical care for complainant, and at the time of the omission the defendant had a legal and statutory duty to act in behalf of complainant in that the defendant was the mother of complainant, and the defendant had assumed care, custody, and control of complainant. (C.R. p. 8)

Appellant entered a plea of not guilty before the jury. (R.R. Vol. 3, p. 25)

The jury found Appellant guilty of the indicted offense. (R.R. Vol. 6, p. 40)

The jury set punishment at 50 years confinement. (R.R. Vol. 6, p. 122)

# ISSUES PRESENTED

1. The evidence is insufficient to prove the culpable mental state.

2.  The Trial Court erred by informing the jury about good conduct time.

3. The Trial Court lacked jurisdiction to hear the instant case and render a judgment because the case was not transferred to its docket.

**STATEMENT OF FACTS**

Appellant was charged with injury to a child by an indictment which reads:

> In the name and by the authority of the State of Texas: The Grand Jury of Dallas County, State of Texas, duly organized at the July term, A.D., 2014 of the 291st Judicial District Court, Dallas County, in said Court at said term, do present that one Williams, Franjessica, defendant on or about the 25th day of June A.D., 2013 in the County of Dallas and said State, did unlawfully, then and there intentionally and knowingly by omission cause serious bodily injury to J. L., a child 14 years of age or younger, hereinafter called complainant, by failing to provide adequate hydration to complainant and by failing to seek adequate medical care for complainant, and at the time of the said omission the defendant had a legal and statutory duty to act in behalf of complainant in that the defendant was the mother of complainant, and the defendant had assumed care, custody and control of complainant.

(C.R. p. 8)

Appellant entered a plea of not guilty before the jury. (R.R. Vol. 3, p. 25)

**James Penny** has known Appellant for a number of years. He considers her a close friend. (R.R. Vol. 3, p. 33)

Penny regarded the complaining witness, J. L., like a son. (R.R. Vol. 3, p. 34)

9

Appellant worked at Victoria' Secret in Northpark. (R.R. Vol. 3, p. 37)

Penny testified he helped Appellant every time she ever asked. (R.R. Vol. 3, p. 40)

Appellant had a vehicle in June of 2013.  (R.R. Vol. 3, p. 42)

Appellant has an uncle named Vernon who also watched Juelz from time to time. (R.R. Vol. 3, p. 42)

Penny last saw Appellant the day before J.L. died. (R.R. Vol. 3, p. 43)

Penny testified that Appellant viewed J.L. "as a very intelligent or almost as Einstein like baby in a sense."  (R.R. Vol. 3, p. 61-62)

At some point during the day Appellant told Penny that J.L. was misbehaving. (R.R. Vol. 3, p. 64)

Penny was asked if he ever spoke to Appellant about her discipline practices. He answered:

> I told her she cannot whoop him. I am all for the spanking. Yes, you can hit the Pamper; you can hit the hand, so forth and so on. But a traditional whooping like I received, like she may have received, or ya'll may have received, no, no. Huh-uh, definitely not.

(R.R. Vol. 3, p. 66)

Penny offered Appellant advice on alternative means of discipline, such as timeouts. (R.R. Vol. 3, p. 67)

J.L. went to Children's Medical Center for his regular pediatric checkups. (R.R. Vol. 3, p. 71)

Penny testified that Appellant lacks intelligence.  (R.R. Vol. 3, p. 73)

Appellant was an easy person to confuse. (R.R. Vol. 3, p. 76)

Appellant was physically abused by her mother, so she went to live with her grandmother. (R.R. Vol. 3, p. 74)

**Mini Delashaw**, is an emergency room doctor at Parkland Hospital. (R.R. Vol. 3, p.

80)

She was on duty on June 12, 2013, when Appellant brought J.L.in for treatment. (R.R. Vol. 3, p. 82)

J.L. was brought in at 6:16 a.m. . Dr. Delashaw immediately "called Code Blue" in order to try to save him. (R.R. Vol. 3, p. 84)

J.L. was pale, wet, he felt cold, he was unresponsive, and he "looked dead." (R.R. Vol. 3, p. 84-85)

Dr. Delashaw asked Appellant what happened. She answered:

> So, we, you know our attention of course is to the patient, the child. So we are asking as we are getting him onto a gurney but we've started CPR and we're doing our best for him, and we asked.
>
> And she said that, and I am going to look at my notes, but I'll just tell you that she found him at the bottom of the stairs tangles up in bands or string and that she also mentioned that she was upset with him last night so she put him in time-out.
>
> So I will tell you that we were all extremely suspicious from the very get-go. Did she find him at the bottom of the stairs tied up in strings that he had been playing with, and why, you know, why was it important that she tell us right off the bat that

12

she was upset with him. That along with just some behavioral cues that are extremely abnormal and suspicious.

(R.R. Vol. 3, p. 87-88)

Dr. Delashaw testified that Juelz was bruised all over his body. (R.R. Vol. 3, p. 90)

Dr. Delashaw pronounced Juelz dead seven minutes after he arrived at the hospital.

(R.R. Vol. 3, p. 92)

J.L. had ligature marks on his wrists and ankles. (R.R. Vol. 3, p. 104)

**Detective Brianna Valentine** went to the hospital on June 23, 2013. After seeing

the injuries sustained by J.L., Detective Valentine decided to speak to Appellant.

(R.R. Vol. 3, p. 119)

Detective Valentine asked Appellant what happened to J.L. She responded:

> She said that she woke up that morning at 6:00 a.m. and found him at the bottom of the stairs tangled up in ribbon. His hands were tangled together. His feet were tangled together. That she had last checked on him the night before at 11:00 after putting him in his playpen with the side down. She stated that he was potty trained so he could get in and out to use the restroom.

13

She said that the day before he had been throwing temper tantrums to the point where she felt like she was growing muscles continuously putting him in time-out. She stated that she gave him three or four spankings using her hand and a switch and that every time she would try to put him in time-out, he would get out and just kept getting out.

When she put him, upstairs to bed, she went back downstairs and ate dinner and decided that she would feed him the next day. She went to sleep and stated that sometime during the night she heard a loud noise that sounded like kicking but thought he was throwing a tantrum again.

(R.R. Vol. 3, p. 122)

State's exhibit 66 is an affidavit written by Appellant. It was admitted without objection and published to the jury. It reads:

My son J.L. was getting in trouble all day. I kept putting him in time-out. He kept getting out so I spank him three or four. Once he chooses not to mind so sent him to bed and follow up there. Put in his playpen. I check on him at 11:00 p.m., at, went to bed. At 6:00 a.m. I awake to check on him. That's when I saw him downstairs tangled up in ribbon and other things and try to wake him, breathe by blowing in him breath and pushing down his chest. Then I took him upstairs to throw water on him, scream wake up. I ran back downstairs and grab my keys. We both got to the car and rush here."

Only me and my son live at the house and no other person came … no other person came over. The other person have a key to my place is my uncle is out of state in Louisiana. I spank with my hand and a switch.

(R.R. Vol. 3, p. 125)

14

Detective Valentine got a search warrant for Appellant's house. (R.R. Vol. 3, p. 127)

Detective Valentine noticed how hot it was inside Appellant's residence. (R.R. Vol. 3, p. 132)

Valentine found a child's chair in a closet with a belt attached to it. (R.R. Vol. 3, p. 150-157)

**Detective Corey Foreman** was dispatched to the hospital on the day in question. (R.R. Vol. 4, p. 18)

Detective Foreman took Appellant downtown to the interrogate her. (R.R. Vol. 4, p. 22)

State's exhibit 75, the interrogation video, was published to the jury. (R.R. Vol. 4, p. 25)

After the interrogation Detective Foreman arrested Appellant for injury to a child.

(R.R. vol. 4, p. 35)

State's exhibit 76, 77, 78 and 79, pages from the Farmer's Almanac were admitted over Appellant's objection to relevance. (R.R. Vol. 4, p. 40)

One June 26, 2013, the high was 98 and the low was 79.  (R.R. Vol. 4, p. 40)

Detective Foreman testified that many times in cases where the killer intends the child's death they do not take the child to the hospital. (R.R. Vol. 4, p. 60)

Detective Foreman talked to Appellant about how she was disciplined as a child and how she disciplined J.L.  . (R.R. Vol. 4, p. 66)

Appellant told Foreman she became frustrated with J.L.'s behavior. (R.R. Vol. 4, p. 67)

**Reade Quinton, M.D.** performed the autopsy on JL. .  (R.R. Vol. 4, p. 90-91)

J.L. was underweight. (R.R. Vol. 4, p. 97-99)

16

J.L. had blunt force injuries on the right side of his head and face. (R.R. Vol. 4, p. 100)

J.L. had chapped lips because he was dehydrated.  (R.R. Vol. 4, p. 101)

J.L. had blunt force injuries to the left side of his head.  (R.R. Vol. 4, p. 103)

J.L. had blunt force injuries to the back of his head.  (R.R. Vol. 4, p. 103)

J.L. had bruises on both hips.  (R.R. Vol. 4, p. 106-107)

J.L. had bruises on his right chest. (R.R. Vol. 4, p. 107)

J.L. had a linear abrasion in the middle of his back and another one on the left side of his back.  (R.R. Vol. 4, p. 110)

J.L. had a cluster of bruises on his right thigh. (R.R. Vol. 4, p. 113)

J.L. had a contusion surrounded by bruises on the inside of his right thigh. (R.R.

17

Vol. 4, p. 114)

J.L. had bruises on his lower right leg.  (R.R. Vol. 4, p. 116)

J.L. had "ligature burns" on his ankles and wrists.  (R.R. Vol. 4, p. 116)

J.L. had bruises on his left thigh. (R.R. Vol. 4, p. 117)

J.L. had bruises on his left knee, and below his left knee. (R.R. Vol. 4, p. 117)

The back of J.L.'s left hand was covered by bruises.  (R.R. Vol. 4, p. 118)

J.L. had abrasions and contusions on his left forearm.  (R.R. Vol. 4, p. 119)

J.L. had bruises on his right forearm. (R.R. Vol. 4, p. 20)

The fluid is J.L.'s eyes were tested. It showed he was dehydrated.  (R.R. Vol. 4, p. 123)

J.L.'s cause of death was dehydration and hyperthermia. (R.R. Vol. 4, p. 129)

Had J.L. been brought to the hospital alive he "most likely" could have been restored to health. (R.R. Vol. 4, p. 133)

Dr. Quinton testified that J.L. sustained no internal injuries. (R.R. Vol. 5, p. 11)

There were no signs that J.L. was strangled. (R.R. Vol. 5, p. 11)

J.L. was "probably" dehydrated "over a couple of days." (R.R. Vol. 5, p. 12)

Dehydration and hyperthermia is an unusual cause of death for a child abuse case. (R.R. Vol. 5, p. 15)

The symptoms of dehydration can be difficult to observe because they vary from person to person. (R.R. Vol. 5, p. 29-30)

State's exhibit 113, a jail call was admitted and published to the jury. (R.R. Vol. 5, p. 54)

**Mary Williams** is Appellant's mother. She was asked questions about State's exhibit 113.   (R.R. Vol. 5, p. 54)

State's exhibit 114, a jail call, was admitted and published to the jury.  (R.R. Vol. 5, p. 56)

Ms. Williams testified that if Appellant had asked her to take J.L. she would have. (R.R. Vol. 5, p. 58)

**Felicia Weaver** is a speech pathology assistant.  (R.R. Vol. 5, p. 60)

Ms. Weaver worked with J.L. starting when he was 18 months old.  She saw him thirty times at his house.  (R.R. Vol. 5, p. 61)

J.L. was "nonverbal."  The goal was to make him normally verbal for his age. (R.R. Vol. 5, p 62)

Appellant expressed concern that J.L. was "not behaving, not following directions." (R.R. Vol. 5, p. 66)

Appellant usually absented herself during therapy. (R.R. Vol. 5, p. 68)

Even after Ms. Weaver, explained that J.L.'s problem to her, Appellant still complained that he was cocky, arrogant, and thick-headed. (R.R. Vol. 5, p. 70)

J.L.'s Uncle Vernon was often present during therapy. "He was much more engaged and involved, and he would see the progress and he would comment on it. And we would sort of share those little victories with each other, which is what I really enjoyed." (R.R. Vol. 5, p. 73)

The State rested. (R.R. Vol. 5, p. 77)

**Kristi Compton, P.H.D.** is a forensic clinical psychologist. (R.R. Vol. 5, p. 99)

Dr. Compton evaluated Appellant to determine the presence of a mental disease or defect. (R.R. Vol. 5, p. 100)

Dr. Compton bases her opinions mainly on objective evidence such as documents, test results, and collateral information. She does not take anything a subject says at

21

face value. (R.R. Vol. 5, p. 103)

Dr. Compton tested Appellant's I.Q. . She described the results:

> Her overall big scheme IQ is approximately 81, and I say
> approximately because there is always some sort of inherent
> error in testing. Eighty –one means that she would fall what's
> called the borderline intellectual functioning range.  Average
> IQ goes from 85 on the very, very low end to 115 on the high
> end of average.
>
> Her functioning is the 10th percentile meaning that 90 percent
> of people in her age range, because it's compared to someone's
> age, in her age range would have performed better.  And so at
> the 10th percentile, about 8 to 9 percent would have scored
> lower than she did.

(R.R. Vol. 5, p. 104)

Appellant functions verbally on the same level as a 12 year old child.  She functions

nonverbally on the same level as an 11 year old child.  (R.R. Vol. 5, p. 105)

Dr. Compton was asked what IQ says about a person.  She answered:

> It tells you how they cope with daily life, how they process
> information. It is really … IQ is more about a person's ability
> to make judgments, reasoning and planning.  All of us have
> different abilities, as we know, but IQ is one of those areas that
> allow you to make good and sound reasoned judgment.
>
> It is kind of how smart are you because how smart are you

22

depends on can you engage in abstract reasoning. Can you see things and kind of come up with a plan, an idea and how to go about it in a prosocial and effective way?

And when you have a lower IQ, it doesn't mean that you can't plan at all or you can't reason at all; it just means that your ability is lower than the population and you are going to have more difficulty kind of navigating certain areas in life.

(R.R. Vol. 5, p. 105-106)

Dr. Compton conducted academic testing. She described her results:

Her skills are either elementary or very low middle school. For example, being able to read and understand and comprehend information, which is just sentence comprehension, about seventh grade, very, very beginning at seventh grade. Her math skills, fifth grade, seventh month, seventh month into the school year.

And what was really interesting, the ability to just read a sight word and understand it was at the fourth grade level, second month. But she was able to read paragraphs and kind of get the gist of it, able to go through the paragraph and just, from the words, to kind of pick up the meaning of it, although she was not able to read every single word.

And then her spelling is seventh grade, second month. So all of these are consistent with borderline intellectual abilities.

(R.R. Vol. 5, p. 108)

Dr. Compton found that Appellant has features of borderline personality disorder

which relates to her being abused throughout her childhood. (R.R. Vol. 5, p. 111)

Borderline personality disorder contributes to lack of intellectual development, anger, and "to inappropriate perceptions of events in a significant way." (R.R. Vol. 5, p. 111)

Dr. Compton was asked if borderline personality disorder was related to Appellant's inappropriate expectations of Juelz. She answered:

> It certainly could be because individuals with this type of personality structure tend to view the world in very concrete and very black and white terms, you're good, you're bad, you're bad toward me, you're good toward me. It's all very black and white.
>
> And there is an over magnification, so to speak, of someone's abilities or their ability to meet your needs. And often with this sort of disorder, it's more about why isn't this person responding to me how I need them to. And it becomes very dysfunctional and very ingrained in the person's mind and their psyche.

(R.R. Vol. 5, p. 112)

Dr. Compton was asked if she had an opinion on the charged offense and what contributed to that opinion. She answered:

> There are two things. It's not necessarily what the defendant

24

says, but it is their behavior, because behavior is the primary indicator of a person's intention, so to speak. And as I said before, I think there is no doubt she intended to hurt Juelz and punish him.

But her behavior when the child passed, taking him to the hospital, that doesn't normally happen.

(R.R. Vol. 5, p. 113-114)

Dr. Compton gave the opinion that Appellant did not commit the charged offense with a knowing state of mind. (R.R. Vol. 5, p. 118-119)

Dr. Compton testified that Appellant stating she thought Juelz might have been dehydrated is reflective of something Appellant should have been aware of at the time of the event. (R.R. Vol. 5, p. 119)

Dr. Compton testified that Appellant taking Juelz to the hospital is evidence she did not act knowingly. (R.R. Vol. 5, p. 120)

Dr. Compton testified that Appellant's behavior during the first fifteen minutes of her interrogation is evidence she did not act knowingly. She elaborated:

Crying in and of itself doesn't mean someone is caring because it depends if they are crying for themselves, are they crying for what happened. I mean it depends.

And some people can produce crocodile tears, so to speak. But these crocodile tears usually do not have any of the emotional expressivity that comes along with a true crying response.
You'll just see kind of tears falling.
And I look for that, is somebody able to orchestrate tearfulness or not.

(R.R. Vol. 5, p. 120)

Dr. Compton is aware that Appellant had been hospitalized for dehydration in the past. (R.R. Vol. 5, p. 123)

The defense rested. Both sides closed. (R.R. Vol. 6, p. 11)

The jury found Appellant guilty of the indicted offense. (R.R. Vol. 6, p. 40)

**Hester Handy** is a preschool teacher. (R.R. Vol. 6, p. 41)

J.L. enrolled in Ms. Handy's class in late May or early June. (R.R. Vol. 6, p. 43)

Ms. Handy testified J.L. was a normal little boy who was excited to play with the other children. (R.R. Vol. 6, p. 45-46)

26

Ms. Handy observed bruises on J.L. and called CPS. CPS failed to do anything. J.L. returned to preschool the next day. Appellant picked him up and was angry that CPS had been called. (R.R. Vol. 5, p. 47-56)

State's exhibit 120 was published to the jury. It is a jail call from Appellant to her mother. Appellant's mother state's that Appellant is responsible for failing to give J.L. enough water. Appellant claimed that she did. (R.R. Vol. 6, p. 56)

**Earnestine Williams** is Appellant's grandmother. She testified Appellant was taken away from her mother Mary for "whipping" her with an extension cord. (R.R. Vol. 6, p. 58-59)

Mary "whipped" Appellant when she broke something, when she combed her hair wrong, and when she cried, among other reasons. (R.R. Vol. 6, p. 59)

When Appellant was 14 Earnestine took her to the doctor for a check- up. She was HIV positive as the result of being raped. (R.R. Vol. 6, p. 64-65)

**Kristi Compton, P.H.D.** testified that Appellant has a major depressive disorder.

27

(R.R. Vol. 6, p. 92)

**James Penny** testified about Appellant's good character traits. (R.R. Vol. 6, p. 102-106)

Both sides rested and closed. (R.R. Vol. 6, p. 114)

There were no objections to the jury charge. (R.R. Vol. 6, p. 115)

The jury set punishment at 50 years confinement. (R.R. Vol. 6, p. 122)

## POINT OF ERROR ONE

## THE EVIDENCE IS INSUFFICIENT TO PROVE

## THE CULPABLE MENTAL STATE

## SUMMARY OF ARGUMENT

No rational jury could have found that Appellant acted knowingly when she failed to give J.L. adequate water.

28

# ARGUMENT

Appellant was charged with injury to a child by an indictment which reads:

> In the name and by the authority of the State of Texas: The
> Grand Jury of Dallas County, State of Texas, duly organized at
> the July term, A.D., 2014 of the 291st Judicial District Court,
> Dallas County, in said Court at said term, do present that one
> Williams, Franjessica, defendant on or about the 25th day of
> June A.D., 2013 in the County of Dallas and said State, did
> unlawfully, then and there intentionally and knowingly by
> omission cause serious bodily injury to Juelz Lombard, a child
> 14 years of age or younger, hereinafter called complainant, by
> failing to provide adequate hydration to complainant and by
> failing to seek adequate medical care for complainant, and at
> the time of the said omission the defendant had a legal and
> statutory duty to act in behalf of complainant in that the
> defendant was the mother of complainant, and the defendant
> had assumed care, custody and control of complainant.

See, Tex. Penal Code Ann. section 22.04 (a)(1)(b)(2)(1)(e).   Appellant argues

the evidence is insufficient to prove she engaged in the charged conduct knowing it

was reasonably certain to cause the result.

On appeal the evidence is legally insufficient if, when examined in the light

most favorable to the verdict, no rational jury could have found the elements of the

offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307 (1979).  The

Court also stated that this constitutional standard "must be applied with explicit

reference to the substantial elements of the criminal offense as defined by law." Id.

29

at 32 n.16. The elements or facts necessary to constitute a particular crime are determined by state law. Under Texas state law, the sufficiency of the evidence is measured "by the elements of the offense as defined by the hypothetically correct jury charge for the case."

The indictment alleges Appellant acted knowingly. "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. See, Tex. Penal Code Ann. section 6.03 (b).

The issue in the instant case is whether a rational jury could find beyond a reasonable doubt that Appellant knew her discipline of J.L. was reasonably certain to result in his death. J.L. was a two year old boy who had a slight verbal problem that was being treated by a speech therapist named Felicia Weaver. She explained to Appellant that J.L. didn't always understand what she expected of him and that he wasn't being disobedient on purpose. Appellant had difficulty understanding what she was being told about J.L.'s development. Appellant has a very low IQ and borderline personality disorder which makes it difficult for her to plan ahead and causes her to see people as either good or bad. Appellant believed that J.L. was being cocky and "thick headed" so she punished him. However, her discipline methods were criminal in nature. Appellant was beaten by her own mother as a

30

child and was removed from the home and placed with her grandmother. A friend of Appellant's, James Penny, testified that he reprimanded her for the spankings of J.L. and recommended she put him in time out instead.

On the occasion in question J.L. was misbehaving all day from Appellants point of view. Eventually she put J.L. in time out by tying him to his little chair and putting him in a closet facing the wall. This occurred on a day when the high temperature was 98 degrees and the low as 79 degrees. The air conditioning was not on in the house, which was still very hot when it was searched by the police the next day. At some point, in the very early morning, Appellant discovered J.L. was either dying or dead and she took him to the hospital in a panic. The detective acknowledged this was unusual in a child abuse case. Defense expert Kristi Compton testified that Appellant's action in taking J.L. to the hospital shows she did not act knowingly when she disciplined J.L. . In other words, Appellant set out to hurt and punish J.L. but not to cause serious bodily injury or death.

The jury was instructed correctly on the lesser included offense of reckless injury to a child but chose to convict Appellant of the indicted offense. Appellant argues the jury acted unreasonably in this respect. Appellant is guilty of reckless injury to a child but not knowing injury to a child. This case should be reversed.

31

**POINT OF ERROR TWO**

**THE TRIAL COURT ERRED BY INFORMING THE**

**JURY ABOUT GOOD CONDUCT TIME**

**SUMMARY OF ARGUMENT**

Appellant was ineligible for good conduct time. The Trial Court erred by instructing the jury to the contrary. Appellant suffered egregious harm because of the erroneous instruction.

**ARGUMENT**

Appellant was indicted for and found guilty of injury to a child. The Court's charge at punishment told the jury that "[u]nder the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through award of good conduct time." This charged tracked article 37.07 section 4 (a) of the Code of Criminal Procedure. Appellant did not object to the charge.

The 37.07 instruction is an incorrect statement of the law when given where the defendant is not eligible to accrue good conduct time because of the nature of hi

conviction.  In the present case Appellant was convicted of injury to a child.  She is precluded by the Government Code from receiving good conduct time credit. <u>Tex. Govt. Code Ann. section 508.149 (a) (9)</u>. The charge should not have been given in this case. It was misleading to the jury. As such, giving it was error. <u>Jimenez v. State</u>, 992 S.W. 2d 633 (Tex. App. – Houston [1st. Dist.] 1999); <u>Jimenez v. State</u>, 32 S.W. 3rd 233 (Tex. Crim. App. 2000) (assuming error, deciding standard for her harm analysis).

The requirements of objecting to the Court's charge are set out in <u>article 36.14</u> through <u>36.17</u> of the Code of Criminal Procedure.  The standard of review for charge error is set out in <u>36.19</u> which reads:

> Whenever it appears by the record that any requirement of article 36.14, 36.15, 36.17, and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears from the record that the defendant has not had a fair impartial trial.  All objections to the charge and to the refusal of specific charges shall be made at the time of the trial.

<u>Tex. Code Crim. Proc. Ann. article 36.19</u>.  The instant case involves a violation of the <u>article 36.14</u> requirement that the judge accurately instruct the jury on the law applicable in this case.  In <u>Almanza v. State</u>, 686 S.W. 2d 157 (Tex. Crim. App. 1985) the Court of Criminal Appeals decided that <u>article 36.19</u> established two

33

standards of review for errors in the Court's charge. If the defendant objected to the error, the statutory standard of harm as interpreted by the Court is whether "some harm" is shown. This standard doesn't apply where the objection is made to charge error that violates the United States Constitution. In the instant case reversal is required unless the error was harmless beyond a reasonable doubt. Becthard v. State, 767 S.W. 2d 423, 430 (Tex. Crim. App. 1989). In Jimenez v. State, 32 S.W. 2d 233,237 (Tex. Crim. App. 2000), the Court of Criminal Appeals claimed that this standard does not apply to non-structural constitutional error to which there was no objection. The Court held that where an erroneous parole instruction is not the subject of an objection the defendant must show that he was denied a fair trial. See, article 36.19; Id., at 238. Because it is difficult, if not impossible, to show actual harm caused by an erroneous jury instruction, such a showing is not required. All, Appellant must do is suggest how prejudice may have occurred, and at that point, the appellate court makes its own assessment as to whether the defendant was harmed to the point of receiving an unfair trial. Ovalle v. State, 13 S.W. 3rd 774 (Tex. Crim. App. 2000). The appellate court does not resolve the issue by asking whether the defendant met a burden of persuasion that he suffered actual harm. Neither party has a burden to prove harm because there ordinarily is no way to prove actual harm. Id.; Sparks v. State, WL 42285 (Tex. App. – Dallas 2001);

34

<u>Warner v. State</u>, Nos. P.D. – 1680-05, P.D. – 16801-05 (Tex. Crim. App. 2008).

Appellant suggests that the charge, which erroneously led the jury to believe that under existing law it was possible for her to be awarded a sentence reduction through the award of good conduct time because she was not eligible for such a reduction was egregious error which was incapable of being cured by the instruction that good conduct time cannot be applied in assessing punishment. This so called mitigating instruction does nothing to correct the earlier misstatement about the general rules of good conduct time credit related to mandatory supervision and parole. Furthermore, there will never be any evidence that the jury was actually misled by such an instruction. The jury cannot be impeached in this manner. Nor can such an issue be raised and advanced in a motion for new trial. <u>See</u>, <u>Tex. Rules Evidence 606 (b).</u> Therefore, considering the record as a whole, the entire jury charge, the nature of the offense, the punishment assessed, and the impossibility of accurately assessing harm under the rules of evidence, this case should be reversed.

**POINT OF ERROR THREE**

**THE TRIAL COURT LACKED JURISDICTION TO HEAR THE INSTANT CASE AND RENDER A JUDGMENT BECAUSE THE CASE WAS NOT TRANSFERRED TO ITS DOCKET**

**SUMMARY OF ARGUMENT**

The 282nd District Court had no jurisdiction over this case.  Its judgment is void.

**ARGUMENT**

The Texas Constitution provides that a court is vested with jurisdiction over a criminal case by the presentment of an indictment or information.  Tex. Const. Art. V. section 12 (b).  An indictment is presented when it has been duly acted on by the grand jury and received by the Trial Court.  Tex. Code Crim. Proc. Ann. Article 12.06.  Statutory provisions also codify the necessary result, implied by article V section 12 above that the Trial Court lacks jurisdiction in the absence of proper presentment.  Tex. Code Crim. Proc. Ann. Article 32.01 (requiring an indictment to

be dismissed if not presented to the Trial Court by date certain). Once the indictment is presented jurisdiction is exclusive in the receiving Court unless it is transferred to another Court. Tex. Code Crim. Proc. Ann. Article 4.16.

The only mechanism for transferring the power to try a felony is by an order of transfer combined with an order of receiving. Combined, these constitute a written agreement between the two courts involved. The transferring Court issues an order formally transferring jurisdiction over the case. The second Court accepts the case by issuing a formal order receiving. See, Tex. Govt. Code Ann. Section 24.003.

The instant case was presented to the 291st District Court of Dallas County, Texas. Jurisdiction was thus invested in that Court. The instant case later appeared on the 282nd District Court where it remained through the entry of judgment. However, there is nothing in the record showing that jurisdiction was ever transferred by the 291st District Court to the 282nd District Court. Therefore it appears that the 291st District Court "retains" jurisdiction, just as article 4.16 states. Appellant contends that the 282nd District Court never acquired jurisdiction in this matter.

Lack of jurisdiction over a case renders a Trial Court's judgment void. Ex parte Seidel, 39 S.W. 3rd 221 (Tex. Crim. App. 2001); Hoang v. State, 872 S.W. 2d 694 (Tex. Crim. App. 1993). A defect which renders a sentence void may be raised

37

for the first time of appeal. <u>Heath v. State</u>, 817 S.W. 2d 335 (Tex. Crim. App. 1991).

The right to be tried in a Court that has properly acquired jurisdiction over a case is absolute. <u>See</u>, <u>Marin v. State</u>, 851 S.W. 2d 275 (Tex. Crim. App. 1993). Such a right to cannot be waived or forfeited, even with consent. <u>Id</u>. Implementation is not optional, it is always required. <u>Id.</u> at 279. Error in this regard is not subject to further analysis. Thus, a defendant may complain about this violation of an absolute right on appeal without having raised the question in the Trial Court. <u>Id</u>. at 280.

Appellant now complains that the 282nd District Court never acquired jurisdiction over the instant case, but he acknowledges that authority is against his position. <u>See</u>, <u>e.g.</u>, <u>Mills v. State</u>, 742 S.W. 2d 832, 835 (Tex. App. – Dallas 1987); <u>Garcia v. State</u>, 901 S.W. 2d 731,732-733 (Tex. App. – Houston [14th. Dist.]1995). These cases all hold that the present issue must be raised the trial counsel or it is waived. However, they simply cite to their antecedents without any Constitutional or statutory authority for the proposition that a jurisdictional defect can be cured by procedural default.

## PRAYER

WHEREFORE Premises Considered, Appellant prays that this Honorable Court

reverse and acquit or remand this cause to the Trial Court for further proceedings

Respectfully submitted:

/s/ Allan Fishburn
Allan Fishburn
State Bar Number: 07049110
211 North Record Street
Suite 450
Dallas, Texas 75202
Telephone (214) 761-9170
Facsimile (214) 742-7313
allanfishburn@yahoo.com

## CERTIFICATE OF COMPLIANCE

I hereby certify the foregoing document contains 6,561 words.

/s/ Allan Fishburn
Allan Fishburn

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief was tendered to

District Attorney's Office located at 133 North Riverfront Boulevard, Dallas,

Texas 75207 on this the 1st day of May, 2015.

/s/ Allan Fishburn
Allan Fishburn